**FILED**
September 22, 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: Christian Rodriguez
DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **JOEL THOM,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | **Civil Action No. 1:26-cv-00373-ADA-ML** |
| PERCEPTA, LLC, DEREK CADOTTE, | § | |
| DARREN SMITH, JOSUE BRISEÑO, | § | **JURY TRIAL DEMANDED** |
| PAULA SMITH, STEPHEN HICKEY, | § | |
| KELLI CLARK, and CHAUNTRE SHAW, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S THIRD AMENDED COMPLAINT

## PRELIMINARY STATEMENT

1. Plaintiff Joel Thom brings this action for race discrimination, retaliation for opposing race discrimination, race-based and retaliatory hostile work environments, and interference and retaliation under the Family and Medical Leave Act arising from his employment with Percepta, LLC and his October 24, 2024 termination. He seeks relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Family and Medical Leave Act.

2. Plaintiff is African American. He was the only African-American engineer on Percepta's Network and Security teams. He alleges that he received materially unequal access to cooperation and work resources, opposed what he reasonably believed was race-based mistreatment, and was subjected to escalating discipline and termination because of that opposition and, as separately alleged, his race.

3. Plaintiff alleges discriminatory treatment in cooperation, work resources, assessment, scrutiny, corrective opportunities, and consequences. He relies on the unequal treatment, comparative circumstances, complaint history, and disciplinary explanations alleged below. A favorable

review did not preclude legitimate later discipline; the claims concern the reasons for and unequal application of the challenged actions.

4. Plaintiff alleges retaliation and race discrimination separately and, where appropriate, alternatively. His retaliation claims do not depend upon ultimately proving that the conduct he opposed itself violated the law. He alleges that his opposition was based on a sincere and objectively reasonable belief that he was experiencing race discrimination.

5. Percepta is a Defendant on all ten Counts. Count IV asserts § 1981 retaliation against all seven individual Defendants. Count V additionally asserts § 1981 race discrimination against Cadotte, Darren Smith, and Hickey. No individual is sued under Title VII, the FMLA, or either hostile-environment theory.

6. Plaintiff alleges that Darren Smith directed a retaliatory course in which Clark and Shaw knowingly helped construct the asserted disciplinary record, with Hickey, Cadotte, Paula Smith, and Briseño participating through their separately alleged acts.

7. Plaintiff alleges his own actions and experiences from personal knowledge. Allegations concerning others' internal actions rest on identified communications, discovery responses, and information and belief where stated. Spoken statements are alleged in substance.

8. Each Count identifies its Defendants and incorporates specified factual allegations. The discrimination, retaliation, environment, and FMLA theories are pleaded separately or alternatively; each claim rests on its own alleged elements and causal connection.

## PARTIES

9. Plaintiff resides in Bastrop County, Texas. He was Percepta's employee and performed his work remotely from Texas with Percepta's knowledge and authorization.

10. Percepta is a Delaware limited liability company with its principal place of business in Michigan. It does business in this District and was Plaintiff's employer. At all relevant times it

had at least fifteen employees for the period required by Title VII. On information and belief, it employed more than 500 employees during the applicable period. Percepta has identified itself in discovery as a joint partnership in which TTEC Holdings, Inc. owns 55% and Ford Motor Company owns 45%. Its answer and discovery responses refer to Percepta personnel as "TTEC personnel" and identify Aaron Chaet, who selected the December 10, 2024 personnel-records production described in paragraph 133, as TTEC Senior Corporate Counsel. (Interrogatories 2 and 15; ECF 20 ¶¶ 1, 47, 63.)

11. Derek Cadotte was Plaintiff's first direct supervisor and again became his supervisor in June 2024. He directed Plaintiff's work and participated in the discipline described below.

12. Darren Smith was Percepta's Chief Information Officer and participated in Plaintiff's reporting arrangement, discipline, and termination.

13. Josue Briseño was Percepta's Vice President of People & Inclusion, as identified in its Initial Disclosures, and participated in its People Innovation function, Plaintiff's discipline, and termination.

14. Paula Smith was Percepta's Global People Innovation Director and participated in Plaintiff's complaint review, PIP, and termination. References to her and Darren Smith identify different persons.

15. Stephen Hickey supervised Plaintiff during part of 2024 and remained involved in the challenged disciplinary process after the reassignment to Cadotte described in paragraph 90. His continued contributions and their alleged use are stated below.

16. Kelli Clark was a member of Percepta's Human Resources/People Innovation function and participated in Plaintiff's complaint handling, attendance inquiry, retrospective timeline, and corrective-notice drafting.

17. Chauntre Shaw was a Percepta Human Resources/People Innovation manager and participated in Plaintiff's complaint investigation and corrective-notice drafting.

**JURISDICTION AND VENUE**

18. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(4), 42 U.S.C. § 2000e-5(f)(3), and 29 U.S.C. § 2617(a)(2).

19. Percepta purposefully employed Plaintiff to perform its business in Texas, maintained the employment relationship with him there, and directed the employment actions at issue to his Texas workplace. These claims arise from that relationship and conduct.

20. Each individual Defendant knowingly directed employment-related communications and actions into Texas in connection with Plaintiff's Texas work. Cadotte repeatedly supervised and disciplined Plaintiff through calls, email, and Teams; Darren Smith directed Plaintiff's work and reporting relationship and communicated his termination; Paula Smith conducted HR meetings and co-delivered the PIP to Plaintiff; Briseño received and addressed Plaintiff's employment complaints and participated in the termination call; Hickey supervised Plaintiff, directed his work, and communicated discipline to his Texas workplace; Clark directed complaint-handling, attendance, and cooperation communications to Plaintiff in his Texas employment; and Shaw conducted HR interviews and directed complaint-handling and cooperation communications to Plaintiff in that employment. Clark and Shaw also prepared disciplinary material concerning the continuation and conditions of that known Texas employment. Plaintiff's claims arise from those purposeful employment activities, not merely from his residence or his experiencing injury in Texas.

21. The claims arise from the connected complaint responses, employment conditions, disciplinary process, and termination described below. Plaintiff seeks relief from each individual only for that person's intentional conduct and causal contribution.

22. Joinder rests on that common series of transactions and the shared factual questions concerning protected opposition, disciplinary history, and termination. Individual liability rests on each person's own knowledge, acts, and intent.

23. Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because the alleged unlawful employment practices affected and were carried out through Plaintiff's authorized workplace in this District and he would have continued working here but for them. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred here.

## ADMINISTRATIVE PREREQUISITES AND TIMELINESS

24. Plaintiff submitted a race-discrimination complaint to the Texas Workforce Commission Civil Rights Division on or about June 5, 2024. In March 2025, through counsel, he filed EEOC Charge No. 471-2025-03515 against Percepta, alleging race discrimination and retaliation arising from the workplace treatment and termination described here. The charge, signed under penalty of perjury on March 12, 2025 and presented to both the EEOC and the state agency identified on the form (MCRC), checked race and retaliation and identified the dates of discrimination as June 26, 2023 through October 24, 2024. Its particulars are set out under headings including "Hostile Work Environment from the Start," "Retaliation Following Reports of Discrimination," "Retaliatory Performance Improvement Plan (PIP)," "Termination," and "Systematic Retaliation and Racial Discrimination," and state that Plaintiff's workplace "soon became hostile due to ongoing racial discrimination, harassment, and retaliation." The charge narrative and the investigation reasonably expected to grow out of it therefore encompass his allegations of continuing racial harassment, a retaliatory hostile environment, unequal treatment, and retaliation.

25. The September 24, 2024 PIP and October 24, 2024 termination occurred within 300 days of the March 2025 EEOC filing. Plaintiff relies on timely discrete acts for his Title VII discrete-act claims. Earlier events supply background and, to the extent part of the same actionable hostile environment with a timely contributing act, support that continuing claim. He does not seek to revive an untimely discrete Title VII claim merely by labeling it continuing.

26. The EEOC issued a Notice of Right to Sue on November 20, 2025. Plaintiff commenced this action on February 17, 2026, within ninety days of receipt. The notice terminated EEOC processing at Plaintiff's request; Plaintiff does not allege that it adjudicated the merits in his favor.

27. The § 1981 claims concern discriminatory interference with the performance, terms, and termination of Plaintiff's employment contract and retaliation for opposing that interference. They do not require administrative exhaustion. The conduct alleged occurred within the applicable four-year limitations period under 28 U.S.C. § 1658.

28. The FMLA claims do not require administrative exhaustion. Plaintiff commenced this action within two years of the October 24, 2024 interference and retaliation alleged below.

## FACTUAL ALLEGATIONS

### A. EMPLOYMENT, QUALIFICATIONS, AND FORMAL PERFORMANCE STATUS

29. Percepta hired Plaintiff on June 5, 2023 as a Senior Network Engineer at approximately $95,000 annually. His first supervisor was Cadotte. Plaintiff had substantial prior network-engineering experience and performed network, firewall, automation, and infrastructure work for Percepta.

30. Plaintiff and Percepta had an at-will employment contract: Plaintiff provided services in exchange for salary and employment benefits. The rights he asserts under § 1981 concern his own contract and its performance, benefits, conditions, and termination.

31. His January 12, 2024 review, covering June 5 through December 31, 2023, scored his overall performance at 3.3, which Percepta describes in discovery as Successful, rated his Job Knowledge–Skills at 4, and included Hickey's comment, "Great start to career at Percepta." The review assigned the numeral 2 for Culture of Service–Teamwork–Respect. The review form's rating key assigns that same numeral to two different ratings: "Learning (L)," for an employee in the role less than six months who is still learning the job, and "Needs Improvement (NI)," for an employee in the role six months or longer. (RFA 8.) The numeral itself does not identify which rating was intended, and no letter rating was selected in the form's overall-rating field. (RFA 9; J.THOM_0082.) The review period began on Plaintiff's first day of employment, and Plaintiff had been in the role less than six months for all but approximately the last four weeks of it. Percepta's interrogatory answers later characterized the numeral as "Needs Improvement"; Plaintiff disputes that characterization. Effective with the March 25, 2024 pay period, Percepta increased his annual salary from $95,000 to $97,137.50; Hickey communicated the merit increase on April 3. Plaintiff acknowledges the numeral recorded on the form and disputes any account that treats it as a needs-improvement finding or treats his performance as uniformly unsuccessful.

32. The merit-planning records identify Plaintiff's rating as 3.30/Successful and do not mark a current corrective action or leave of absence for him in the CA/LOA field. The workbook instructions distinguish an affirmative mark for a current CA or LOA from a blank entry, and the accompanying HR communication states that current CAs and LOAs had been marked. Plaintiff

received the merit increase and alleges that he had no current CA or LOA at that eligibility snapshot. This allegation concerns his formal status then; it does not assert that no informal criticism existed or that he could never later be disciplined.

33. On April 29, Hickey told Plaintiff that he had advised Darren Smith that Plaintiff did an excellent job on the completed change. On May 6, Hickey again expressed confidence in Plaintiff's technical ability and described value in his automation work while distinguishing communication concerns. These contemporaneous assessments support Plaintiff's qualifications and his dispute with an undifferentiated account of inability to perform his role.

34. Plaintiff was the only African-American engineer on the Network and Security teams. Cadotte, Darren Smith, and Hickey knew his race through their work with him. Paula Smith, Briseño, Clark, and Shaw knew that Plaintiff was reporting race-based mistreatment before taking the actions alleged against them.

35. Percepta's Code of Conduct, effective March 2024, states that "Percepta both requests and requires its employees to report their concerns." It identifies as reporting channels the employee's supervisor or manager, the next level of management, the local People Innovation (HR) representative, a Global or Regional Director, a People Innovation (HR) Director or Senior Manager, and an ethics hotline, and states: "You may raise your concern verbally or in writing." It provides that "[i]f you believe that you are subject to discrimination or harassment, . . . you must immediately contact one of the Compliance Contacts"; that "[d]iscrimination and harassment based on . . . race . . . is strictly prohibited"; that "Percepta takes all alleged Code of Conduct violations seriously and investigates each allegation"; that "[r]etaliation against an employee who reports a suspected violation is strictly prohibited"; and that "Percepta may also take disciplinary action against supervisors or other management who condone, permit, or fail to

report any Code of Conduct violation.” Its list of unacceptable behavior includes “[d]iscriminating or harassing conduct of any kind, regardless of whether it rises to the level of unlawful”; “[r]estricting production or interfering with others in the performance of their jobs”; “[d]isrupting, coercing, or creating an undesirable work environment for other Percepta employees, clients, customers, or third parties”; and “[m]aking false or misleading verbal or written statements about Percepta or its clients, employees, products, processes, customers, and/or work situations.” (Percepta Code of Conduct, effective March 2024, pp. 2–5.) Plaintiff used the Code’s reporting channels. He does not assert a separate contract claim for any departure from policy; the Code and its application bear on notice, motive, and the reasons given for discipline.

## B. UNEQUAL TREATMENT AND COMPLAINTS PRECEDING THE FORMAL DISCIPLINE

36. On or about June 26, 2023, Jim Sheldon, a white security employee and important source of knowledge about Percepta’s network, told Plaintiff, in words or in substance, “If I had known you would send Windows Administration requests to the Windows Admins, I would never have told them to hire you!” and “Yeah, we should never have hired you!” When Plaintiff objected, Sheldon responded, in words or in substance, “I see you don’t know your place; I’ll show you.” Plaintiff objected and reported the remarks and treatment to Cadotte. Plaintiff understood the remarks together with the unequal cooperation and subordinate treatment he experienced as racially demeaning. He does not allege that the words contained an express racial epithet.

37. On the recorded May 6, 2024 call with Plaintiff and Hickey, Cadotte acknowledged that Plaintiff’s earlier concerns involving Sheldon had been raised to HR and were part of the reason for the 2023 reporting reorganization. Cadotte stated, in words or in substance, “you don’t realize Jim was coached”; “this was an HR matter”; and “This was raised immediately to HR[.] HR is

fully aware of it[.] Steve is aware of it and that's large in part for the reorganization was to squash the differences by putting you on one team." (May 6 recording, approx. 00:01:04–00:01:11.)

38. Cadotte also stated that Sheldon had been coached. Hickey discussed improving the working relationship, offered to intervene if Sheldon failed to assist, and expressed confidence in Plaintiff's technical ability while addressing communication concerns. Plaintiff disputes the adequacy and evenhandedness of the response; he does not allege that Percepta took no action at all. Hickey stated, in words or in substance, "I'm not worried about your technical capabilities Joel no one's questioning" whether Plaintiff knew the technical requirements of his job, and "I know you know how to do the core functions of the . . . senior network engineer role." (May 6 recording, approx. 00:48:44.)

39. In an April 29 written exchange, Cadotte separately told Plaintiff that Sheldon had been spoken to, that Cadotte and Hickey perceived a willingness by Sheldon to improve, and that Plaintiff was no longer asking Sheldon for assistance. Plaintiff alleges that reduced requests did not establish that the underlying assistance problem was cured because he had begun avoiding an employee whose treatment he had reported. He alleges that management afforded Sheldon informal correction and an opportunity to improve while later formalizing Plaintiff's requests, objections, and communications as disciplinary deficiencies.

40. Plaintiff's early reports opposed perceived race-based disparate treatment in context: subordinating remarks and unequal cooperation directed at the team's only African-American engineer. He alleges that Cadotte understood this from the reported conduct, known racial context, and related discussions. The later acknowledgment of HR involvement corroborates notice of the dispute but does not alone establish each conversation's content. Plaintiff relies on

what he communicated to each recipient; later express race complaints continued and clarified that opposition. Independently, the early events provide context for the later claims.

41. Plaintiff observed Sheldon providing assistance and review to non-African-American engineer Saideepthi Malisetty that Sheldon resisted providing to Plaintiff. Percepta's change records identify Sheldon as peer reviewer and tester on Malisetty's RFC0156756 and identify Plaintiff as reviewer and tester of his own RFC0147895. Plaintiff does not allege that he never received another person's review: at least one May 2024 change was reviewed by Malisetty. He alleges materially unequal access to the review and institutional knowledge needed to perform comparable network work.

42. Plaintiff helped onboard Malisetty but did not receive comparable structured assistance, mentoring, or access to collaborative troubleshooting. Both performed network-engineering work involving the same environment and interacted with the relevant managers and security personnel. Plaintiff alleges that the unequal support impaired his ability to complete work and develop professionally; he does not assert that every aspect of their roles or disciplinary histories was identical. Percepta admits that Malisetty began employment in March 2024 as a Network Engineer (ECF 12 ¶ 10), approximately nine months after Plaintiff was hired as a Senior Network Engineer; Percepta's later review records identify her as a Senior Network Engineer (paragraph 43). The newer engineer whom Plaintiff helped onboard received the structured support he was denied.

43. Percepta's produced records identify Malisetty as a Senior Network Engineer supervised by Cadotte during the January–December 2024 review period. Cadotte rated her overall performance 3.00, "Successful," while stating that he wanted better documentation, greater focus on network diagrams, more learning from Sheldon, transfer of that knowledge into

documentation, and greater assertiveness in seeking knowledge. Cadotte already knew that the network diagrams had gone un-updated because of changes others made. On or about March 6, 2024, in a Microsoft Teams exchange with Plaintiff, Cadotte wrote: "I know the diagrams weren't updated during the migration to temp solutions were being implemented that Takie and Jim were changing but I know Stephen told me he was asking you guys to refresh diagrams for PCI audit - just unsure if equally done for rest." "Jim" refers to Sheldon, "Takie" to an outside consultant, and "Stephen" to Hickey. Cadotte thus attributed the diagram gap to Sheldon's and the consultant's changes. He nonetheless treated Malisetty's documentation shortfalls as developmental feedback within a "Successful" review, and Plaintiff is aware of no corrective action directed to Sheldon or Malisetty for documentation, while Cadotte made network-diagram documentation a PIP deficiency against Plaintiff (paragraphs 107 and 110). Plaintiff alleges this differential treatment of the same documentation condition as part of the disparate treatment he reported and challenges here. The review records that Malisetty was provided ACloudGuru and Udemy training and describes her professionalism and commitment to the team as "second to none." Its workflow records Cadotte's submission on February 2, 2025, Darren Smith's signoff on February 9, and a February 16 calibration process listing Briseño, Paula Smith, and others.

44. The review provides comparator context for the same manager's treatment of documentation, knowledge-transfer, training, and development concerns involving another Senior Network Engineer. It was completed after Plaintiff's termination; Plaintiff does not allege identical circumstances or a conclusively established disciplinary history. He relies on the materially relevant similarities and differences described here.

45. Management also knew that network diagrams and documentation were incomplete while multiple employees and a consultant changed temporary solutions during the migration, and that

another employee had been assigned substantial infrastructure-documentation work. Plaintiff alleges that Cadotte later individualized the shared documentation condition as a PIP deficiency against Plaintiff without applying materially comparable scrutiny or discipline to the other participants.

46. Plaintiff also disputed the attribution of work on TASK5417561 and TASK5508043. In a captured September 27 exchange, he told Malisetty that ticket ownership had changed after his end-user follow-up and that she had closed the tickets after he reassigned them to himself. Malisetty responded that updating older tickets could change assignment automatically and that she had not known he had reassigned them. Plaintiff alleges that the assignment and closure fields did not necessarily identify everyone who performed the underlying work. His claim concerns whether the later assessment credited his actual work fairly, not an allegation that Malisetty's explanation itself establishes intentional appropriation or racial motive.

47. Plaintiff experienced recurring objections when he sought information, change documentation, or assistance from Sheldon and other team members. Cadotte treated Plaintiff's questions as stubbornness or unprofessionalism while tolerating dismissive responses to Plaintiff's requests. Plaintiff disputes that his questions reflected stubbornness or unprofessionalism. Plaintiff alleges differential treatment in comparable work interactions, not that every disagreement over technical procedure was discrimination.

48. At the March 12, 2024 meeting with Darren Smith, Hickey, and HR representative Kelli Clark, Plaintiff was told to take responsibility for the network and that Sheldon was not required to perform the assistance Plaintiff sought. Plaintiff also was excluded from interviewing candidates for his network team. He alleges that Darren Smith maintained unequal support arrangements despite Plaintiff's complaints about their effect on him.

49. During the April 2024 lab-build discussions, Plaintiff sought systems assistance needed for his network test environment. On April 29, 2024, at approximately 10:44 a.m. Central Time, while the events later used to support Plaintiff's discipline were unfolding, Cadotte wrote to Hickey, "I'm ignoring him before I unload on Joel - been all morning dealing with his BS." That same day, Cadotte told Plaintiff, in substance, that reporting structures could change and that Plaintiff had better hope he did not report to Cadotte again. Plaintiff promptly challenged the remark and later reported it to Hickey, including during the May 6 call and in his May 21 written message. Plaintiff alleges that Cadotte's contemporaneous statements bear on his hostility toward Plaintiff and the credibility and neutrality of Cadotte's later selection, description, and editing of the April 29 events for inclusion in Plaintiff's disciplinary record. (Percepta 0004018.)

50. When Plaintiff repeated Cadotte's remark, including, in words or in substance, the words "hope" or "pray," Cadotte responded that they were taken out of context and supplied language about working together and ending a cold war. After the reassignment, Cadotte denied that the remark was a threat. Plaintiff disputes Cadotte's characterization that the words were taken out of context and disputes his denial that the remark was a threat. Plaintiff understood it as threatening adverse consequences if Cadotte again supervised him; that reporting relationship and subsequent discipline materialized. Plaintiff alleges the words and resulting course, not an admission by Cadotte of retaliatory intent.

51. In May 2024, Plaintiff repeatedly told Hickey that requiring request and change tickets, traceable change details, peer review, testing information, and professional answers was consistent with the direction management had given concerning IT service management. Plaintiff reported that Sheldon and Petty resisted those requirements, that he had to plead for a request ticket before he could create a corresponding change ticket, and that his efforts to apply the

process were recast as aggressive. Plaintiff disputes that those efforts were aggressive. Plaintiff described the resulting treatment as a caste-like hierarchy in which he was expected to act as inferior, remain beneath coworkers, or stay in his place. Hickey responded that people needed to respond to inquiries and that no one was exempt from assisting. Plaintiff alleges that these contemporaneous complaints supplied management with notice of both the unequal-treatment theory and the operational context of his questions before his reassignment to Cadotte.

52. On June 13, 2024, the day Plaintiff's reassignment to Cadotte was announced, Cadotte wrote Hickey: "Am I defensive, absolutely, he shines a spotlight on my teams ineffectiveness all the time but thats his job." In the same exchange, Cadotte maintained that he was not attacking Plaintiff and stated that Plaintiff read him differently. Plaintiff alleges that Cadotte's acknowledgment that Plaintiff was performing his job by exposing team "ineffectiveness," coupled with Cadotte's admitted defensiveness, supports an inference that Cadotte resented Plaintiff's scrutiny and later characterized legitimate technical questions, process objections, and requests for documentation as performance or conduct deficiencies. Plaintiff does not allege that the statement expressly referenced race or, standing alone, proves discriminatory or retaliatory intent.

53. Plaintiff alleges that Hickey personally participated in the unequal response to the work conflicts Plaintiff described as a caste-like hierarchy. Hickey knew that Plaintiff's requests concerned tickets, documentation, traceable changes, and assistance necessary for his work, and acknowledged that coworkers were expected to respond and assist. Yet Hickey subjected Plaintiff's communications seeking that cooperation to the disputed warning and standing monitoring condition described in paragraphs 83–85. Plaintiff alleges that this imposed a disciplinary burden on the only African-American engineer seeking cooperation while the white

coworker whose resistance and subordinating treatment he reported received the informal coaching and opportunity to improve described in paragraphs 37–39. Plaintiff alleges unequal handling of the same underlying work conflicts, not that coworkers occupied identical positions or that Hickey offered no assistance. He alleges that Hickey intentionally applied that unequal treatment because of Plaintiff's race, separately from the allegation that Hickey punished him for reporting it.

54. In May 2024, Plaintiff undertook troubleshooting of a problem reported by Jacob Singer and sought assistance from Palo Alto Networks. Plaintiff learned that Sheldon had made a change affecting that same environment without notice or documentation available to Plaintiff. That interfered with Plaintiff's troubleshooting and led him to ask for a traceable explanation.

55. Singer informed Plaintiff that Sheldon had disabled a GlobalProtect extension. Plaintiff's allegation about who made that change rests on Singer's report; Plaintiff personally experienced the lack of notice and the resulting troubleshooting difficulty.

56. Plaintiff also encountered resistance from Sheldon and Larry Petty when he asked for a request ticket for network changes on May 8. Hickey joined the discussion and indicated that the tracking request was reasonable. Plaintiff complained that he had to repeatedly seek routine cooperation that other engineers received.

57. After Plaintiff's June 2024 race complaint, Darren Smith personally challenged Plaintiff's coordination of after-hours work and directed him to handle assignments through the channels Smith specified. Plaintiff alleges that the restrictions, considered with the withdrawal of assistance and reporting reassignment, isolated him and made completion of his work more difficult.

58. In his written complaints Plaintiff described a caste-like hierarchy and treatment intended to keep him in his place or make him feel inferior to Sheldon and Petty. He specifically connected that hierarchy to resistance when the only African-American engineer requested ticket hygiene, traceable changes, peer review, testing information, knowledge sharing, and adherence to professional engineering and IT-service-management practices. He reported the effect on his mental and physical well-being. Those descriptions reflected his experience of the treatment; their racial significance is alleged from their context, the treatment of the only African-American engineer, and the materially different cooperation and support allegedly extended to non-African-American coworkers. Plaintiff does not allege that technical disagreement alone establishes race discrimination.

59. Plaintiff found the recurring exclusion, dismissive treatment, and unequal support unwelcome. He alleges that race motivated the pattern and that his subsequent race-related opposition supplied a separate reason for its escalation. His own reports distinguish particular incidents and participants rather than attributing every act to every Defendant.

**C. PROTECTED OPPOSITION AND ACTUAL KNOWLEDGE**

60. On March 8, 2024, Plaintiff sent Clark an email titled Honest Feedback of My Onboarding Experience, copying Hickey, about his experience with Sheldon and lack of assistance. Plaintiff relies on the actual content and context of this report and his 2023 reports, without equating all workplace grievances with opposition protected by Title VII or § 1981.

61. On May 24, 2024 at approximately 9:45 a.m., Plaintiff sent Formal Complaint: Work Place Harassment to Clark, copying Hickey and Darren Smith. He asserted his right to work free of discrimination, described the May troubleshooting and ticketing incidents, and objected to inferior treatment and the caste-like hierarchy. He reasonably and sincerely understood that

treatment to be race-related. Percepta disputes that interpretation; Plaintiff pleads the complaint's contents and context rather than alleging an express use of the word race where it did not appear.

62. On May 29, Plaintiff sent Formal Complaint: Retaliation to Clark and Hickey, copying Darren Smith, challenging the disciplinary response to his May 24 complaint.

63. On June 4, 2024, Plaintiff replied in writing to Hickey, copying Clark and Darren Smith, and contemporaneously disputed Hickey's May 24 characterization. He wrote that the feedback had been given only because he had formally notified HR of harassment and discrimination that morning; that it was "an attempt on your part to try backdating a retaliatory complaint with HR against my earlier complaint to HR"; and that "during the call we (i.e., Derek Cadotte, yourself, myself) had on 5/6/24, no verbal warning was given to me specifically. Rather, we (i.e., Derek Cadotte, yourself, myself) all agreed to start with a clean slate henceforth and to ALL act with courtesy, professionalism and respect." He reminded Hickey that he had reported Cadotte's threats during that same call and asked for examples of the communications Hickey considered unacceptable. Darren Smith replied that day only that "[i]f you have any inquiries related to your complaint, please direct those to Kelli Clark (HR) as noted in her responses." None of Hickey, Clark, or Darren Smith supplied the requested examples, followed up on Plaintiff's objection that the verbal-warning account was inaccurate, or corrected or withdrew that account; Smith's reply directed Plaintiff to Clark. This was Plaintiff's contemporaneous contention; he does not allege that its being written made the contention established fact. (June 4, 2024 email thread, "Re: Email for review for Joel.")

64. On or about June 5, Plaintiff submitted to the TWC Civil Rights Division a written employment-discrimination complaint expressly alleging harassment and discrimination based on race.

65. On June 6, Plaintiff told Darren Smith in writing that he had filed a race-based discrimination complaint and spoke with him that day. Darren Smith thus had direct notice of Plaintiff's race-related opposition before the later PIP and termination. Percepta's Interrogatory 10 answer identifies Darren Smith, Hickey, and Clark as having learned of the agency complaint from Plaintiff's emails before termination.

66. Percepta's produced June 6 email shows Darren Smith forwarding Plaintiff's expressly race-related Teams complaint to Clark and Briseño, copying Hickey. The forwarded message identified a race-discrimination complaint to TWC and requested freedom from race discrimination and retaliation. Darren Smith's covering message also accused Plaintiff of avoiding work and spending working time on lengthy communications. This contemporaneous circulation placed the race-related nature of Plaintiff's opposition before Briseño months before the PIP and termination. Plaintiff disputes the covering message's account of his work and communication conduct. (Percepta 0010472–0010474.)

67. Darren Smith expressed that nonperformance belief on June 6, the same day Plaintiff expressly reported Smith to Clark for retaliation. The circulation itself contained Plaintiff's race-related opposition and criticism of Smith's complaint handling. Plaintiff alleges that Smith treated those complaint communications as evidence against Plaintiff's performance and advanced that assessment to HR and Briseño. The same-day allegation does not assume that the separate formal email naming Smith preceded Smith's covering message. The asserted retaliatory connection rests on the protected content already before Smith, his own response to it, and the later disciplinary and termination use of that response. (Percepta 0010472–0010474; Plaintiff's June 6 correspondence to Clark.)

68. On June 6 and June 7, in emails to Clark copying Hickey and Darren Smith, Plaintiff expressly opposed discrimination based on race and retaliation for reporting it. The correspondence continued during June.

69. Plaintiff's June 6 email specifically named Darren Smith as the person retaliating against him for filing the race-discrimination complaint. Darren Smith received that accusation as a copied recipient. Plaintiff described the call as hostile and intimidating and asked that the retaliation stop.

70. During their June 6 call, Darren Smith discussed colleagues' concerns about Plaintiff and questioned Plaintiff's forwarding of company correspondence. Plaintiff explained that he was preserving correspondence concerning his complaints. Plaintiff alleges that his lawful opposition and documentation were treated as reasons to scrutinize him; he does not claim an unlimited right to remove unrelated confidential business information or disregard lawful work directions. During the call, Darren Smith told Plaintiff, in words or in substance, that he "need[ed] to stop making accusations that you don't have evidence for," that such an accusation, "to me is harassment," and "don't accuse me of doing things 'cause I will file a complaint." When Plaintiff questioned the continuing assignment, Smith stated, in words or in substance, "If you want to read more into it than that, go ahead. Run with it. File. I don't care. I have a business to run." Smith also declined Plaintiff's request that the work be shared with Malisetty, stating, in words or in substance, that "Sai has other—other things on her plate." (June 6 recording, approx. 00:01:10–00:01:57, approx. 00:04:09, approx. 00:09:44, and approx. 00:13:49.) Plaintiff disputes that his complaints were accusations without evidence or harassment, and disputes any characterization of the June 6 conversation or his early-June communications as warnings, coaching, or discipline warranted by his conduct. Percepta later identified Darren Smith's June 6

email to Clark about recent interactions with Plaintiff, and his June 7 email to Clark documenting the June 6 conversation, among the documents on which the termination participants appear to have relied. Percepta also lists a Microsoft Teams chat between Darren Smith and Plaintiff in early June 2024 among the warnings, coaching, counseling, or other disciplinary communications it contends were issued to Plaintiff. (Interrogatory 3, pp. 3–4; Interrogatory 6, pp. 5–6.)

71. Plaintiff continued his race-related complaints in August and September, including the August 6 HR meeting with Chauntre Shaw and LaSondra Johnson, August messages to Cadotte, and meetings with Paula Smith on August 30 and September 3, 5, and 16. He opposed the PIP at the September 24 meeting and in writing afterward. On October 7 he escalated race-discrimination and retaliation complaints to CEO Karen Gurganious and Briseño; on October 8 he reported further retaliation to them.

72. Plaintiff's August 22 correspondence to Cadotte expressly referred to harassment and discrimination based on his race and retaliation for reporting it. His September 25 communication again expressly connected his PIP challenge to a hostile work environment based on race. Cadotte therefore had direct notice of race-related opposition before the October 8 warning and termination.

73. On June 13, Plaintiff expressly told Shaw that his complaint concerned harassment and discrimination based on race and that he had filed with TWC/EEOC. Shaw acknowledged the racial-discrimination complaint in her response. Her knowledge therefore arose from direct communications, independently of whether Percepta listed her in its Interrogatory 10 answer.

74. During the recorded August 6 meeting, Plaintiff again expressly identified race as the basis of his complaint, described his agency filing, and told Shaw that he believed Cadotte's write-up

threats retaliated against his race complaint about Sheldon. Shaw stated that she had read and reviewed Plaintiff's emails. She introduced LaSondra Johnson as an HR witness to the discussion. Shaw explained, in words or in substance, "I always like to have someone, especially something that has the potential to have some legal ramifications, that is witnessed, right? So, she's our witness." Shaw also told Plaintiff, in words or in substance, "Love the fact that you went to Texas Workforce Commission." Plaintiff alleges Johnson's presence as a witness and attributes no statement or retaliatory act to her based merely on that presence. (August 6 recording, approx. 00:00:19–00:07:41.)

75. Plaintiff explained to Shaw that he had complied with the rollback instruction, sought clarification of the allegedly inconsistent directions concerning Sheldon, and wanted HR to hear Cadotte's own explanation. Shaw described the displayed direction as requiring teamwork and advised Plaintiff to follow Cadotte's guidance because he had not yet shown her enough to establish an improper direction. She also warned about defiance of authority. Plaintiff disputes that he defied authority or refused Cadotte's guidance; he had complied with the rollback instruction. Plaintiff alleges that her treatment of his report, together with her later characterizations and drafting role, supported management's disciplinary framing despite the contrary account he supplied. (August 6 recording, approx. 00:17:30–00:25:45.)

76. When Plaintiff recounted Cadotte's statement that he had better hope he did not report to Cadotte again, Shaw responded, in words or in substance, "that is a threat, and who said that to you?"; Plaintiff identified Cadotte. Later in the meeting, Plaintiff identified Malisetty as receiving peer review and support he said he had been denied, and explained the job-description rationale given for excluding him from interviews while Sheldon participated. Shaw acknowledged that the peer-review comparison was information needed to assess the allegation.

Plaintiff thus supplied specific subjects for investigation, not merely a legal label. (August 6 recording, approx. 00:35:49–00:36:40 and approx. 00:43:04–00:50:34.)

77. Paula Smith discussed Plaintiff's race and retaliation concerns with him before participating in the PIP and termination. On the recorded August 30 call, she asked whether Plaintiff was the only African-American on the team and remarked, in words or in substance, "on all three teams network security and systems you're the only African-American," and, referring to his agency filing, stated, in words or in substance, "for you to feel that way and to have to take it to the EEOC, I would venture to say that" it was "pretty serious." Her September 3 discussion also acknowledged his stated resort to TWC and EEOC, and on September 5 she stated, in words or in substance, that she knew Plaintiff already had his "claims with . . . TWC and . . . EEOC." Percepta's Interrogatory 10 answer does not list Paula Smith among those aware of the agency filings. (August 30 recording, approx. 00:18:01 and approx. 00:26:34–00:26:42; September 5 recording, approx. 00:35:59.) Briseño received Plaintiff's October 7 escalation before participating in termination and said at the October 24 meeting that he had reviewed Plaintiff's concerns. These allegations concern each person's actual notice and participation, not constructive knowledge based only on a job title.

78. Plaintiff alleges that each relevant recipient understood his race-related opposition from the reports' content and context before undertaking the challenged conduct. His retaliation claims rest independently on that opposition. He also alleges statutory participation to the extent his resort to the administrative process qualifies; he does not equate every grievance or HR meeting with protected participation.

79. Plaintiff made written complaints, attended HR meetings, supplied explanations and records, and requested that discriminatory and retaliatory treatment stop. At times he asked to

communicate in writing or to consult counsel, and he disputed HR's questions and findings. He contests Percepta's portrayal of that conduct as an absence of meaningful cooperation, while acknowledging that HR sought additional information and that he did not agree to every requested discussion.

80. On June 4, Clark closed Plaintiff's complaints, describing a refusal to meet and an inability to obtain additional information. Plaintiff had supplied written complaints and supporting communications and explained his desire to consult counsel before further statements. On June 7, Clark acknowledged receiving many allegation emails but continued to characterize the absence of a fact-finding meeting as preventing a proper investigation. Plaintiff disputes her adverse characterization of the actual record, while acknowledging that she requested additional answers and that he sought delay before some further discussions. (June 4 and June 7 emails, Formal Complaint: Retaliation, pp. 40–41 and 54–56.) Percepta's sworn answer to Interrogatory 3 later identified, among the materials on which the termination participants appear to have relied, "the absence of documentation and information Plaintiff submitted to Defendant's People Innovation ("PI") Team in May 2024 and in June 2024 despite multiple requests from the PI Team for the same," as well as documentation by PI Team members of investigations of Plaintiff's claims of harassment. Plaintiff alleges that Percepta thereby carried the handling of his own discrimination and retaliation complaints into the termination decision. (Interrogatory 3, p. 4; see paragraph 100.)

81. On June 10, Clark personally sent Plaintiff an attendance message stating that mandatory meetings had been missed, that the team had not heard from him or seen requested/approved vacation, and directing him immediately to contact his leader and explain. Clark and Hickey had been copied on Plaintiff's request, made on or about May 9, for June 10–12 bereavement and

HR's response, on or about May 10, noting those requested dates. After Plaintiff supplied that correspondence and objected that Clark was joining the retaliation, Clark acknowledged his scheduled bereavement but defended the inquiry. Plaintiff disputes that he missed mandatory meetings without approved leave; he was on the previously requested and acknowledged bereavement leave. Plaintiff alleges that Clark knowingly advanced an adverse attendance account despite the notice supplied to her and used her HR authority to intensify scrutiny after his race and retaliation complaints. (Formal Complaint: Retaliation, pp. 1–5 and 30.)

82. Following the August 6 meeting, Plaintiff supplied additional communications to Shaw. On August 6, Shaw acknowledged their volume and requested time to review them. On August 7 she confirmed that his retaliation allegation concerning the rollback and compelled interaction had been placed in the record. On August 8 she stated that additional supporting evidence was unnecessary but requested answers to specified questions. On August 9, after Plaintiff requested counsel before answering those questions, Shaw characterized delay as refusal to cooperate and invoked the duration of the broader investigation. Plaintiff disputes that his request for counsel before answering was a refusal to cooperate. Plaintiff alleges that this characterization selectively discounted his actual meeting participation, detailed complaints, and supplied evidence, and helped develop the noncooperation account later used against him. He does not allege that Shaw had waived her request for answers or that every follow-up question had already been answered. (Shaw Teams exchanges, August 6–9.)

## D. DISCIPLINE, PIP, AND TERMINATION

83. On May 24 at approximately 5:34 p.m., Hickey sent Plaintiff an email stating: "Per our previous phone conversation on 5/6/24, which occurred between you, Derek, and me, I gave you a verbal warning to ensure that you're being professional and courteous at all times." The same

email required that Hickey be copied on all of Plaintiff's business-related communications. Plaintiff states from personal knowledge that he was not told on May 6 that he was receiving a verbal warning. The May 6 recording does not contain the word "warning," and Hickey told the participants, in words or in substance, "from here forward clean slate I don't want to hear about what happened in the past." The call nevertheless included genuine communication feedback, directions about working with internal resources, and general statements by Hickey about consequences if the same issues recurred. Plaintiff disputes that those statements constituted the completed disciplinary warning later described, notes that Percepta's December 10, 2024 production contained no document recording a verbal warning (paragraph 133), and alleges that the later characterization and monitoring escalated the response to him. (May 6 recording, approx. 00:54:43.)

84. On May 24 at approximately 9:51 a.m., Hickey had told Plaintiff that feedback from earlier that week was already in his drafts. Plaintiff does not rely solely on the elapsed hours after his complaint to allege that every part of the feedback originated that day. He challenges its disciplinary characterization and unequal application in the broader sequence.

85. At approximately 9:45 a.m. on May 24, Plaintiff sent Clark a formal workplace-harassment complaint and copied Darren Smith and Hickey. Approximately thirty minutes and forty seconds later, Hickey sent Clark for review the draft that characterized the May 6 meeting as a verbal warning and imposed a standing condition that Hickey be copied on Plaintiff's business communications. Hickey sent the same body to Plaintiff later that day, recirculated it to People Innovation on June 20, and forwarded it to Darren Smith on August 26, four days before the Corrective Action Notice. Plaintiff acknowledges that Darren Smith had requested complaints about Plaintiff before the formal complaint arrived that morning. He alleges that the chronology,

Hickey's admitted lack of firsthand knowledge of the preceding group-call incident, the first documentary appearance of the disputed verbal-warning characterization eighteen days after the May 6 call, and the later use of Hickey's materials in the disciplinary process support an inference of intentional retaliatory participation. (Percepta 0002185, 0009845, 0002166, 0009837, and 0009951.)

86. Despite Plaintiff's June 4 written challenge described in paragraph 63, Hickey continued to advance the disputed account after the June 13 reassignment announcement: he recirculated it on June 20 and forwarded it to Darren Smith on August 26, after the July 1 processing acknowledgment. Percepta also identifies his corrective-notice input and materials relied upon by termination participants, as stated in paragraph 141. Plaintiff challenges Hickey's own selection, characterization, and transmission of those materials. Darren Smith's August 21 removal proposal identified Hickey's May 2024 email as its example of prior written notice: "Please note that Mr. Thom has received both verbal and written notifications from his IT leaders in the past several months (e.g.: Mr. Hickey email in May 2024)." (Percepta 0002570.) Percepta also lists Hickey's May 24 email and his screenshot compilation among the documents on which termination participants appear to have relied. (Interrogatory 3, pp. 3–4.)

87. After the June 5 agency complaint and June 6 report naming Darren Smith, Plaintiff was reassigned in June to report to Cadotte, the manager whose April statement he had challenged. The reporting change was part of a broader reorganization. Plaintiff alleges that the choice to place him under Cadotte, with knowledge of the complaint and unresolved conflict, contributed to the retaliatory escalation rather than alleging that the whole reorganization existed solely because of him.

88. Produced internal histories contain an entry describing an April 12 PIP recommendation. Plaintiff does not allege that all consideration of discipline began after his May complaint. He alleges that the merit-status snapshot, the timing and content of his reports, and the actual source and implementation of any earlier recommendation must be distinguished from the later disciplinary actions challenged here. The existence of the entry alone does not establish that a PIP was delivered in April. Plaintiff disputes that any performance or conduct deficiency then warranted a PIP; he received a merit increase that spring and had no current corrective action marked at the merit-eligibility snapshot (paragraphs 31–32).

89. On August 21, Darren Smith emailed Briseño and Paula Smith, copying Clark and Shaw, and proposed two options: “Move to termination immediately” or place Plaintiff on leave, revoke his accesses, and ask PI to assist in determining “what to do next as we don’t see a path of Mr. Thom returning.” Smith stated that conduct allegations were being “packaged” into a written notice. This proposal preceded the August 30 notice, the September 24 PIP, and the October events later cited in support of termination. Plaintiff alleges that Smith’s stated position bears on whether the subsequent disciplinary process offered a genuine opportunity to improve, while acknowledging that the proposal does not alone establish when final corporate authorization occurred. (Percepta 0002570.)

90. Plaintiff identifies June 13 as the announced reassignment to Cadotte. On July 1, Cadotte wrote that Kronos showed Plaintiff moved under his organization and that the reorganization had been processed while Cadotte was away. Plaintiff distinguishes the announcement he experienced from later system processing and does not allege that the July 1 message fixes the precise HR effective date. His claims concern the resulting authority, work conditions, and disciplinary use, not an inference that consideration of the realignment first began on June 13.

Cadotte had already described a contemplated realignment in a May 1 communication to Clark, subsequently forwarded to Darren Smith in August. (Percepta 0009583; Cadotte Teams correspondence, July 1.)

91. Smith's August 21 message expressly thanked Clark and Shaw for their support in the matter concerning Plaintiff. It recounted an unsubstantiated-complaint finding, alleged insubordination and failure of duties, and stated that additional information was being packaged into a written notice. Smith then sought immediate action through termination or leave with access revoked. Plaintiff disputes the message's assertions that he was insubordinate, frequently absent, not taking assignments, unwilling to work with team members, combative with leadership, or failing his job duties, and disputes that he had received the prior verbal and written notifications it described, other than the disputed May 24 email addressed in paragraphs 83–86. Plaintiff alleges that Clark and Shaw's later complaint and disciplinary work occurred with knowledge of this proposed removal course. He relies on their separately alleged actions, not the thank-you or copied status alone, to allege knowing participation. (Percepta 0002570.)

92. In August, Cadotte attributed failed or delayed network work and disagreements about collaboration to Plaintiff. Plaintiff disputes that he refused the directed rollback of the TTEC change: he alleges that he raised a technical objection, had arranged vendor support, and then performed the rollback. He also disputes that asking for specific assistance or explaining why he had no question for Sheldon amounted to the insubordination attributed to him. He acknowledges the underlying work disputes and does not allege that the change was completed successfully that night. Percepta later listed an August 2 exchange among the incidents underlying the PIP's reference to past public disagreements: Cadotte directed Plaintiff to work with Sheldon and Malisetty on analysis and internal testing, and Plaintiff responded that he did not want or need

assistance from Sheldon. Sheldon was the coworker whose conduct Plaintiff had reported as race-based harassment. (Interrogatory 9, pp. 8–9.)

93. Percepta's records include an August 30 Corrective Action Notice later described in its EEOC Position Statement as a delivered Final Warning. Plaintiff did not receive that notice during his employment and disputes that it was delivered to him or operated as a final warning. In its amended Interrogatory 5 answer, Percepta stated that although delivery was planned, it appeared the notice was not actually delivered. RFA 17 admits the narrower proposition that no document created on or before termination was identified evidencing delivery. Plaintiff alleges nondelivery from his personal knowledge, corroborated by those responses; he does not allege that the document never existed. On the recorded August 30 call—held on the date the notice bears—Paula Smith, whom Percepta identifies as having had input into the notice, discussed Plaintiff's complaints with him for approximately fifty-five minutes and did not deliver or mention any corrective action or warning. On September 16, when Plaintiff described the failed August change and Cadotte's role in it, Paula Smith told him, in words or in substance, "But you were not disciplined for this though," and later stated her understanding that "you thought you were going to be written up for that and you were not written up for that." (August 30 recording, approx. 00:00:00–00:55:43; September 16 recording, approx. 00:24:31–00:26:14.)

94. Percepta's Interrogatory 3 answer lists the August 30 notice among the materials on which termination participants appear to have relied. The corrected nondelivery account materially differs from Percepta's earlier description of a delivered warning. Plaintiff alleges that reliance on the notice as a prior warning misstates the notice he actually received, even though other feedback was communicated.

95. Cadotte’s contemporaneous account of the unsuccessful TTEC VPN-failover change states that he advised cancellation, that the team would regroup to review Plaintiff’s plan, and that the issue concerned Percepta routing. He explained why Sheldon’s knowledge of the historical routes warranted involvement and stated that the decision should not diminish Plaintiff’s efforts or suggest that Palo Alto had misguided him. The same account accused Plaintiff of refusing internal-team partnership. Plaintiff disputes that accusation and alleges that the later disciplinary treatment selectively individualized a team-routing problem and omitted the manager’s cancellation decision and mitigating context. He does not equate eventual rollback compliance with proof that no preceding disagreement occurred. (Percepta 0007322.) Percepta admits that it identified no document created on or before October 24, 2024 recording any work Sheldon performed on that failover work between August 2 and October 24, 2024. (RFA 18.) After Plaintiff’s termination, Percepta assigned the work to Malisetty, who worked with Sheldon to build the tunnel and coordinate with TTEC. After change freezes and a cancellation, the change was implemented on February 20, 2025 under RFC0165421, and failover testing was completed on March 1, 2025 under RFC0165991. (Interrogatory 12.)

96. The earlier corrective-notice draft quotes Plaintiff’s August 19 statement that he had the right to perform his duties without harassment and discrimination “based on my race” and that further harassment, discrimination or retaliation for notifying management and HR was unlawful. The quoted statement identifies Kelli Clark and Chauntre Shaw as HR recipients of his complaints, and also names the managers and HR personnel whose conduct he opposed. The draft describes Plaintiff as continuing his “unprofessionalism and poor behavior” by sending that response. The same entry first alleges that Plaintiff had not acknowledged required Code of Conduct training and then asserts that his response had no relation to that conversation. Plaintiff disputes the use

of his race-related opposition as an additional example of misconduct; he does not omit the training context in alleging that the draft expressly connected his protected complaint to the assembled disciplinary narrative. (Percepta 0030172.) The quoted complaint entry was absent from the August 30 version previously identified. Plaintiff alleges that the later removal did not eliminate the retaliatory influence of the underlying communications and their derivative characterizations on the discipline and termination. He does not allege that editing alone establishes intent or identifies the person who made the deletion. (Percepta 0002572–0002574.)

97. Plaintiff was not given the alleged verbal warning, a separate written warning, or the August 30 final warning before the September 24 PIP. He acknowledges receiving communications and feedback and the September 24 PIP; he disputes that the particular warnings later described as completed discipline were given to him. Percepta's Position Statement described an August 30 Final Warning followed by unsuccessful improvement and, more generally, informal coaching, a verbal warning, written corrective action, and a PIP. Its original Interrogatory 5 answer described the final notice as delivered; the amended answer stated that it appeared not to have been delivered. Percepta also admitted that it identified no document created on or before October 24 evidencing delivery, transmission, presentation, or display of that notice. Those responses support Plaintiff's account of nonreceipt. Its separate admission concerning no verbal-warning record is limited to the identified personnel-record exhibit; Plaintiff does not allege that this admission conceded no verbal warning was ever communicated.

98. Plaintiff challenges the accuracy and use of the claimed warning history. Authority to skip discipline does not establish that a warning said to have occurred was communicated. He alleges that the claimed opportunities to improve and assessments were misdescribed and unequally applied, supporting pretext together with the complaint-linked grounds and decision participants'

reliance. He claims neither an absolute entitlement to progressive discipline nor a numerical quota for every duty.

99. Percepta identifies Cadotte, Clark, and Shaw as involved in drafting the August 30 Corrective Action Notice and identifies Darren Smith, Briseño, Hickey, and Paula Smith as also having input. Clark separately compiled the retrospective timeline from earlier communications and management accounts. Plaintiff alleges that Clark and Shaw knowingly used their complaint-handling knowledge and adverse characterizations to help construct the disciplinary account after receiving Smith's August 21 removal proposal. The allegation does not depend on identifying either woman as the typist of every sentence in the August 23 draft. (Original and amended Interrogatory 5; Percepta 0000236–0000237 and 0002570.)

100. Percepta's Interrogatory 3 answer identifies among the materials termination participants appear to have relied upon the claimed absence of information submitted in May and June, early-August HR meetings and messages, HR investigation documentation, and the August 30 notice. Plaintiff alleges that Clark's and Shaw's adverse characterizations therefore entered the employment-decision process through both the complaint/investigation record and the disciplinary document they helped draft. He alleges, on information and belief supported by those identified contributions and reliance categories, that their intentional contributions were adopted in the PIP and termination course. He does not treat Percepta's qualified reliance answer as an admission identifying the author or adoption of every disputed sentence. (Interrogatory 3, pp. 5–7; Interrogatory 5, p. 8.) Although Percepta states that the August 30 notice was not delivered, it identifies that notice among the materials on which termination participants appear to have relied; the injury Plaintiff alleges from Clark's and Shaw's drafting flows from that reliance, not from delivery.

101. The August 26–27 “Confidential - Joel CA” thread connected Smith’s direction with the management and HR drafting work. On August 26, Smith informed Shaw, Clark and Paula Smith, copying Cadotte and Hickey, that he had made updates and had sent the writing to Cadotte and Hickey for comments because they had the detail. He asked Cadotte to send it to the HR recipients when complete. Cadotte replied to the same group that he had made modifications to the version Smith had shared with him and Hickey. On August 27, Smith told the drafting group: “These events show a pattern of behavior, which was expressed to Joel in both verbal and written communication, prior to any complaints.” Plaintiff disputes the asserted chronology because protected complaints preceded the reconstructed disciplinary account and were known to members of that group. He alleges that this exchange shows Smith’s personal direction and framing of the account being developed through the participants’ separately identified contributions. (Percepta 0000464–0000465; 0002560–0002561.)

102. On August 27, Shaw sent Cadotte a draft in the “***Confidential***” email chain. Cadotte responded directly to her, explaining that he had “added back an event before May 1st” as a reason for Smith’s May 1 meeting, questioning why other material had been “omitted,” stating that, while adding the April 29 section, he “did shorten other areas further in the timeline,” and adding a section separating expectations going forward. He then forwarded that exchange and an attachment named “08.27.2024 J Thom FWW.docx” to Smith, so Smith could see what Cadotte had given Shaw. Plaintiff alleges that Shaw personally participated in the iterative selection and organization of the disciplinary account, considered together with her known receipt and evaluation of Plaintiff’s race-related complaints, her cooperation characterizations, and Percepta’s identification of her as a drafter. This exchange does not identify who removed the race-complaint passage discussed in paragraph 96, and Plaintiff does not attribute that deletion to

Shaw or Clark merely from their involvement. Shaw's own email in that exchange carried the notice, "Please remember your Code of Conduct must be completed on or before August 23, 2024." Plaintiff completed the 2024 Code of Conduct training on or about August 16, 2024, before that deadline, as Percepta's own training records submitted in the TWC proceeding reflect. The corrective-notice account nonetheless faulted Plaintiff in connection with that training, as described in paragraph 96. (Percepta 0009629.)

103. The earlier draft also contains an "End of May, 2024 – June, 2024" entry describing Plaintiff's accusations of deception and unresponsiveness against Clark as attacks on HR and unprofessional conduct. Plaintiff alleges that the treatment of his complaints about HR's handling, together with the expressly race-related August 19 entry, shows how the disciplinary record incorporated his opposition and the disputes about its investigation. The August 27 notice's cover identifies behavior, policy violations and unprofessional conduct, leaves the Performance box unchecked, and leaves the verbal- and written-warning rows blank, although its narrative asserts a May 6 verbal warning. Plaintiff relies on those specific features together with the disputed warning history and the individual contributions alleged above. He does not treat a blank field as a concession that no warning occurred or attribute every draft statement to every participant. (Percepta 0030171; 0009631–0009632.)

104. On August 27, Shaw replied to Darren Smith, Cadotte, Clark, and Paula Smith, copying Hickey, after Smith asserted that the pattern preceded complaints and requested titles for Cadotte and Hickey. She agreed to add the titles and reported forwarding the document to Aaron for review, requesting earlier availability, and scheduling an August 28 meeting. Plaintiff relies on her handling of revisions and advancement of the account, together with her complaint handling

and drafting contributions; consultation for review alone does not establish retaliatory intent. (Percepta 0002559–0002560.)

105. Paula Smith reviewed Plaintiff's complaints and communicated findings in September. On September 16 she explained that she had not personally determined that Plaintiff failed to do his job and could not independently rate his technical performance. She also stated that managers could impose justified performance or conduct discipline. Plaintiff alleges that she later accepted Cadotte's disputed accounts in imposing discipline despite knowing his race-related complaints against the management involved. Percepta's amended answer to Interrogatory 8 states that Cadotte created the initial draft of the PIP on or about September 16, 2024, the date of that call; edited it on or about September 17; and finalized and delivered it on September 24. Percepta identifies Cadotte, Paula Smith, and Aaron Chaet as the persons who drafted, reviewed, or approved the PIP. (Interrogatory 8 and amended answer.) On that call Paula Smith told Plaintiff, in words or in substance, "I never said you did not do your job. I never said that," and "I can't rate your performance." (September 16 recording, approx. 00:13:10 and approx. 00:16:33.)

106. On September 20, Briseño told Darren Smith that he had "instructed Paula to put Joel's PIP on hold and to not deliver it next Monday," explaining that he needed "more time to engage with legal and come up with a different plan before we pull the trigger," and stating that Smith would hear from him again on Monday or Tuesday "with a game plan." Plaintiff alleges that this nonprivileged employment direction shows Briseño's personal control over the timing and purpose of the proposed discipline and permits competing inferences concerning the relationship between the PIP and the termination plan. Plaintiff does not allege that seeking legal advice was improper or rely on the substance of privileged advice. (Percepta 0004014.)

107. Cadotte and Paula Smith delivered the thirty-day PIP on September 24. It addressed professional conduct, teamwork and communication, job duties, and documentation. It threatened further discipline, including termination, for failure to meet its conditions. It identified no discrete incident by date, as Percepta admits in RFA 7. Percepta first identified incidents underlying the PIP's reference to past public disagreements in its July 31, 2026 answer to Interrogatory 9, which it described as a preliminary listing of six incidents dated between April 29 and August 23, 2024. (Interrogatory 9, pp. 7–9.) Two of those six incidents—April 29 and August 23, 2024—identify Randy Pickering, a non-African-American member of the IT team, as a participant in the same group exchanges. Percepta admits that Plaintiff was the only African-American engineer on its Network and Security teams (ECF 20 ¶¶ 1, 10), and Paula Smith confirmed that he was the only African-American on the network, security, and systems teams (paragraph 77). Plaintiff is aware of no warning, corrective action, or PIP issued to Pickering arising from those exchanges and alleges on information and belief that none was issued. Plaintiff knows of no other member of those teams who received a PIP, corrective notice, or comparable discipline for communication disputes during his employment; the records of discipline issued to other employees are within Percepta's possession.

108. At the delivery meeting, Cadotte did identify the TTEC change call as an example and said he did not have the underlying documentation in front of him. Plaintiff disputed the example and described his records and compliance with the rollback direction. Plaintiff therefore alleges a contested and incompletely substantiated explanation, not that no oral example was ever supplied. When Plaintiff asked for examples, Paula Smith stated, in words or in substance, "Derek would have to provide an example," and later, "I am not a technical individual. I cannot assess your performance, nor can I evaluate in totality whether or not you have been meeting the

objectives of the role." When Plaintiff continued to press for specifics, Cadotte stated, in words or in substance, "I'm just not going to go through this right now in this fashion." (September 24 recording, approx. 00:11:31, approx. 00:22:56, and approx. 00:27:48.)

109. At that same meeting Cadotte acknowledged improvement in Plaintiff's participation and sharing of work status. Cadotte stated, in words or in substance, "I'm seeing improvement as of today," and that Plaintiff could be a strong contributing member of the team "just simply by improving communication. That's the only gap in performance in the areas that we've described." (September 24 recording, approx. 00:04:22 and approx. 00:06:36.) The written PIP's Leader Comments, authored by Cadotte, state: "Joel, I am confident that you can continue to be a strong contributing member of our team by improving your communication and performance in the areas described above." (J.THOM_0085.) By stating that Plaintiff could "continue to be" a strong contributing member, rather than become one, Cadotte's own words presuppose that Plaintiff already was a strong contributing member when the PIP issued. The PIP contemplated feedback and recorded reviews during its thirty-day period. Plaintiff disputes that its conditions were evaluated fairly in light of his work, explanations, and improvement. He received no completed end-of-period assessment identifying the specific unmet requirements before termination. He does not infer that no internal review existed merely because a separate review document has not been located in the audited production.

110. The PIP contemplated measurable results, feedback, and recorded reviews. At delivery, management supplied qualitative directions and examples, including the change dispute and missing diagrams. Paula Smith referred Plaintiff to the final PIP box when he asked about measurement. He alleges that the response failed to clarify how compliance would be judged and

that managers inconsistently distinguished cooperation from disagreement and complaint activity from neglect of work.

111. Plaintiff alleges that undisclosed or changing criteria hindered correction and that the disputed examples, earlier removal proposal, and later PIP/AUP reliance support pretext. He challenges the criteria actually applied, their advance communication, factual basis, equal application, and decision use. He does not infer that no criteria existed merely because no numerical benchmark or particular document was produced.

112. Percepta investigated and communicated conclusions about Plaintiff's complaints, including an August 21 communication concerning cooperation and September findings from Paula Smith. Plaintiff disputes the sufficiency and impartiality of the investigations and the conclusions drawn from his submissions. His claim is not that every investigation was nonexistent or that an unsubstantiated complaint necessarily means unlawful retaliation.

113. During the PIP period, Plaintiff's workstation was isolated following security-software detections involving an application he had used previously. Hickey told him that he also used the application. Plaintiff sought an explanation of the different effects on their computers and the troubleshooting performed. He alleges the resulting interruption affected his work and supplied context for later accusations about his communications. He does not allege, without supporting technical facts, that an automated detection itself proves deliberate targeting or that Hickey had an identical configuration.

114. The September 27 Network-Systems exchange concerned iTerm2-related isolation that interrupted Plaintiff's work. Hickey investigated and described a false positive. On September 30, when Plaintiff requested vendor involvement, Hickey said a case was already open and identified Petty as the contact. Petty said he had added an exclusion rather than worked on a

case. When told of that discrepancy, Hickey said he could fix it. Plaintiff's later requests for a case number and technical explanation arose from those conflicting communications and the significance of terminal access to his daily work. Plaintiff alleges what was communicated, not that these messages alone establish whether any person actually opened a vendor case.

115. In the October 22 account sent to Paula Smith with Darren Smith copied, Cadotte described Plaintiff's follow-up with Petty as seeking evidence and continuing to build a case. Cadotte also stated that he had directed Petty to comply; later correspondence supplied a possible technical explanation and workaround. Percepta's answer to Interrogatory 13 subsequently characterized the October 22 exchange as pestering and contrary to the spirit, if not the letter, of the first PIP condition, and stated that it combined with other behavior to precipitate termination. Plaintiff disputes Cadotte's characterization that he was building a case and disputes Percepta's characterization of the exchange as pestering or as a violation of any PIP condition. Plaintiff attributes that characterization to Percepta's answer, not to an unsupported assertion that Hickey or Petty used the same words. Plaintiff alleges that reasonable work-related follow-up was selectively recast as misconduct and used against him in the context of the race-related complaints known to those managers. The technical report is not alleged to be automatically protected race opposition merely because it concerned information security. (Percepta 0000666–0000679; Interrogatory 13.)

116. On October 8, the day after Plaintiff's escalation to the CEO and Briseño, Cadotte issued Company Policy Violation, accusing Plaintiff of spending the workday on personal matters and harassing Cadotte through company systems. The email expressly discussed Plaintiff's discrimination and retaliation complaints and directed them to HR. Plaintiff had also used HR and the executive escalation channels. Plaintiff disputes that he spent the workday on personal

matters or harassed Cadotte, as further alleged in paragraph 117. He alleges that the volume, purpose, and content of his communications were mischaracterized to turn his continued race-related opposition into misconduct.

117. Plaintiff disputes the claim that he spent the entire day on unrelated personal matters or refused his job duties. He acknowledges that protected opposition does not excuse threats, unlawful disclosure, or otherwise unprotected misconduct. His allegation is that his actual communications sought answers and an end to the discrimination and retaliation, and that Percepta's stated conduct rationale was not its genuine reason for the discipline and termination. Percepta's sworn answer to Interrogatory 4, stating its reasons for the termination, describes the October 8 "personal matters" as including "repeatedly contacting and making unfounded accusations directed at Mr. Cadotte," and states that later that day "Plaintiff accused leadership of retaliation." Plaintiff disputes that his accusations were unfounded and that his complaints of harassment and retaliation were misconduct. The October 8 email itself directed Plaintiff to report his "claims of harassment, discrimination, or retaliation" to People Innovation. Plaintiff alleges that Percepta's own statement of its termination reasons thus includes his complaints of harassment and retaliation. (Interrogatory 4, p. 5; J.THOM_0086.)

118. On October 8, Briseño supplied the warning language to Darren Smith and Cadotte, copying Paula Smith, and instructed Cadotte to send it to Plaintiff that day. The proposed message characterized Plaintiff's communications about harassment, discrimination, and retaliation as personal matters and harassment while directing such complaints to HR. Plaintiff disputes that those communications were personal matters or harassment. Briseño then instructed management to monitor Plaintiff and stated: "We are getting closer to an end, and your updates will help us close this out as planned." Plaintiff alleges that this statement connects Briseño

personally to the complaint-related discipline, continuing monitoring, and anticipated outcome sixteen days before the termination. (Percepta 0008211.)

119. On October 14, Cadotte questioned ticket completions and project status. Plaintiff responded with explanations and again opposed what he believed was retaliatory scrutiny. Plaintiff disputes the characterization that he simply refused constructive engagement. On October 22, he sought help concerning a SentinelOne alert and questioned the troubleshooting; he disputes Percepta's later characterization of that exchange as conduct warranting termination. Percepta's answer to Interrogatory 4 lists the October 14 exchange among its termination reasons, stating that Plaintiff "accused Mr. Cadotte of harassment and retaliation" and then sent accusatory messages. (Interrogatory 4, p. 5.)

120. Cadotte's October 14 message to Paula Smith, later forwarded to Darren Smith, stated that he reviewed Plaintiff's and Malisetty's ticket completions and documentation before asking about their work. He described asking both employees the same question and seeking not to overlook accomplishments. Plaintiff disputes the completeness and equal application of the resulting assessment, including whether it accurately credited underlying work rather than assignment or closure fields alone. He does not allege that no operational information was reviewed. The particular report, attribution method, contrary information considered, and use in the termination decision remain part of the disputed explanation. (Percepta 0001583.)

121. On October 24, Briseño told Plaintiff, in words or in substance, "I've looked at all your concerns and the company . . . thoroughly investigated them. And none of these complaints of unlawful conduct were substantiated, okay? So with that said, the matter is closed." When Plaintiff asked questions about the PIP and his retaliation concerns, Briseño stated, in words or in substance, "this is not the forum to ask questions." Darren Smith then stated, in words or in

substance, “You’re not meeting the standards and the requirements set forth in the PIP, which is a performance improvement plan, such as the Acceptable Use Policy,” and terminated him effective immediately. Plaintiff repeatedly asked which requirements he had not met and which policy he had violated; neither Smith nor Briseño identified one. (October 24 recording, approx. 00:00:57–00:07:52.) Plaintiff disputes that he failed to meet the PIP’s standards and requirements or violated the Acceptable Use Policy, and disputes Briseño’s statement that his complaints had been thoroughly investigated and were unsubstantiated. Percepta’s amended Interrogatory 3 answer identifies Darren Smith, Briseño, Paula Smith, Emily Pastorius, and Aaron Chaet as termination decision participants. Plaintiff alleges that Darren Smith, Briseño, and Paula Smith made or approved the decision with knowledge of his race-related opposition. Plaintiff does not rely on his objections during the October 24 call as the cause of the termination announced on that call. He does not allege that the termination, its timing, or its execution date had been fixed before his October 22 medical notice; the communications described in paragraphs 106 and 118 anticipated a later “game plan” and a future “end” without stating a termination date.

122. On October 22, 2024, Plaintiff notified Cadotte in writing that he had an important doctor’s appointment on Thursday, October 24 for an injury that likely would require surgery and that he had rescheduled the one-on-one for earlier that day. The produced image of Plaintiff’s message is cropped after the first letters of the word following “likely need,” but the surrounding produced email supplies the meaning: Cadotte told Paula Smith and Darren Smith that Plaintiff had suggested “possible surgery time ahead” and “may be looking to a potential surgical leave.” (Percepta 0000666–0000671.)

123. On the evening of October 22, Cadotte transmitted Plaintiff's message to Paula Smith and Darren Smith—two of the five termination participants Percepta later identified—and wrote that the timing "could complicate future planning should he elect to go on FMLA post-surgery." The following morning, Cadotte again told the same recipients that Plaintiff had identified a surgical appointment that conflicted with the scheduled meeting and requested a morning time. Plaintiff's notice and its transmission therefore preceded his October 24 termination. (Percepta 0000666 and 0000672.)

124. Plaintiff subsequently underwent meniscus surgery for the injury identified in his October 22 notice and required a period of incapacity and continuing medical treatment and recovery. Because the termination ended his employer-sponsored health-insurance coverage before the surgery, Plaintiff paid the resulting medical and surgical expenses out of pocket. He alleges those expenses as consequential economic damages caused by the termination, to the extent recoverable under the particular statute asserted.

125. Percepta terminated Plaintiff on October 24, 2024—the date of the disclosed medical appointment and approximately thirty-seven hours after his written notice. Plaintiff alleges this sequence as part of the termination chronology and resulting damages. He does not allege that the medical notice, standing alone, proves the race-based retaliatory or discriminatory causation required by Counts I through VIII.

126. Plaintiff had worked for Percepta continuously for more than twelve months when he gave notice and was terminated. He worked a regular full-time schedule and, on information and belief, had worked at least 1,250 hours during the twelve months preceding October 24, 2024. The precise payroll and time records are maintained by Percepta.

127. Plaintiff performed his work remotely. His residence was not his FMLA worksite. On information and belief, the office from which Percepta assigned his work or to which he reported employed at least fifty Percepta employees within seventy-five miles. Percepta maintains a Texas location in Houston: Paula Smith told Plaintiff, in words or in substance, “We do have a location in . . . Texas though in . . . Houston,” and Chauntre Shaw identified herself, in words or in substance, as “Houston’s HR or People Innovation Manager.” (August 30 recording, approx. 00:48:17; August 6 recording, approx. 00:01:18.) Percepta is owned by TTEC Holdings, Inc. and Ford Motor Company, and its own filings describe its personnel as TTEC personnel (paragraph 10). The identity of the office, the employees assigned to it, and the relevant headcount are maintained by Percepta. Plaintiff therefore alleges that he was an eligible employee and Percepta was a covered employer under the FMLA.

128. Plaintiff’s October 22 notice identified an injury and a physician appointment two days later. As alleged in paragraphs 122–123, the surrounding correspondence conveyed possible surgery and surgical leave, and Cadotte expressly recognized potential FMLA leave in his message to Paula Smith and Darren Smith. Plaintiff alleges sufficient notice to begin the FMLA process, including necessary inquiry. He would have taken medically necessary surgery and recovery leave; termination prevented that process and leave and caused loss of benefits and coverage.

129. The challenged treatment impaired Plaintiff’s work, caused distress, and made him fear discipline for continuing his complaints. The termination ended his salary and benefits. Plaintiff alleges that the cumulative pattern of unequal assistance, humiliating interactions, restrictive supervision, and retaliatory discipline would deter a reasonable employee from opposing

discrimination. He also alleges, as a distinct theory, that the race-based component was sufficiently pervasive to alter his working conditions.

130. Plaintiff sought and received professional treatment for the emotional distress described in paragraph 214.

131. Plaintiff distinguishes incident dates from first documentation, communication, and later decision use. Events before May 24 principally support unequal-treatment allegations, while later development and use support discrimination and retaliation separately or alternatively. Earlier complaints also support retaliation where their content and the recipient's knowledge permit; May 24 is not a concession that protected opposition began then. The alleged inferences rest on the specific acts, comparisons, communications, and decision use, rather than demographics alone. Plaintiff made the reports described in paragraphs 36–40, 47–82, and 116–119 through the channels the Code of Conduct identifies (paragraph 35): his managers (Cadotte and Hickey), the next level of management (Darren Smith), People Innovation (Clark, Shaw, Paula Smith, and Briseño), and the chief executive. The conduct he reported—withheld assistance and documentation, resistance to change-management requests, remarks he understood as racially demeaning, the April 29 remark, disciplinary accounts he contended were inaccurate, and retaliation he attributed to management and People Innovation personnel—is of the kinds the Code lists as unacceptable. Plaintiff is aware of no corrective action taken against Sheldon, Petty, Pickering, Cadotte, Hickey, or any other person arising from the conduct he reported. Percepta instead applied the Code's conduct standards to Plaintiff: the PIP lists the Code of Conduct as a resource for its expectations, the October 8 email invoked the Code and the Acceptable Use Policy, and Percepta states that it terminated Plaintiff for violating the Code (paragraphs 107, 116, and 134; J.THOM_0083–0086). Plaintiff alleges that Percepta applied the same Code

differently to him, the only African-American engineer on his teams, than to the employees whose conduct he reported, and that it treated his reports under the Code as grounds for discipline.

132. The alleged environment recurred from Plaintiff's 2023 report through October 2024: unequal assistance, compelled interactions with reported employees, restrictive supervision, adverse complaint characterizations, disputed warning history, and escalating discipline. Effects included obstructed troubleshooting and information access, lost work opportunities, altered reporting and communication conditions, and fear of discipline for complaints. The racial-environment theories rely on conduct linked to race; the retaliatory-environment theories rely on conduct linked to opposition known to the responsible actor. Neither nexus substitutes for the other.

133. A certified TWC open-records packet contains a finalized employer response submitted on November 7, 2024, fourteen days after Plaintiff's discharge. The packet identifies Thomas & Company and Goldie Shelton as the preparer and contact, marks an attachment as present, and states "See attached." In the response, the employer narrative states that the "last incident" occurred on August 30, 2024 and concerned an asserted violation of the code of conduct, behavior, performance, and teamwork. A separate structured field identifies October 23, 2024 as the "Final Incident Date." Other fields state that Plaintiff knew of the policy and had been informed in writing, but identify the person who discharged Plaintiff and that person's title as "Unknown." Plaintiff disputes that he committed the asserted violations, that any incident occurring on August 30 or October 23, 2024 warranted discharge, and that he had been informed in writing of any final warning. Percepta states that it does not appear the August 30 Corrective Action Notice was sent to the Texas Workforce Commission in connection with Plaintiff's

separation. (Interrogatory 16.) On November 7, 2024, Plaintiff executed a sworn written request, delivered to Percepta through counsel on November 8, for all records, documents, notes, or memoranda used or that may be used relative to his qualifications for employment, promotion, transfer, compensation, or disciplinary action, including records held by Percepta's agents. On December 10, 2024, Percepta, through Aaron Chaet, who determined its contents, produced 86 pages (J.THOM_0001–0086) consisting of Plaintiff's résumé, offer letter, payroll records, January 2024 performance review, September 24 PIP, and October 8 email. Percepta admits that the production contains no document titled "Final Warning," no written warning or corrective-action document dated August 29 or 30, 2024, and no document recording a verbal warning, and states that it does not appear the August 30 Corrective Action Notice was included. (RFAs 1–4; Interrogatory 15.) The production contains no investigation notes, witness statements, or investigation findings. Although Plaintiff's request expressly sought records relating to disciplinary action, the production contained none of the final warning or written corrective action that Percepta later asserted. Plaintiff first learned that Percepta characterized his disciplinary history as including an August 30, 2024 "Final Warning" and written corrective action when Percepta submitted its EEOC Position Statement on August 28, 2025, as alleged in paragraph 97; Percepta admits submitting that Position Statement on that date (ECF 20 ¶ 64). Plaintiff alleges these facts as bearing on the consistency of Percepta's accounts, not as a claim that the production was required to contain any particular document.

134. Percepta's later sworn discovery answers materially differ from that near-contemporaneous account. Its September 2026 answer to Interrogatory 13 states that no particular incident involving Plaintiff appeared to have occurred on October 23, 2024. It instead identifies an October 22 interaction and alleges that Plaintiff's conduct violated "the spirit, if not the letter" of

a PIP condition, along with unspecified other interactions. Its amended answer to Interrogatory 5 states that it appears the August 30 Corrective Action Notice, although slated for delivery, was not actually delivered, and its response to Request for Admission 17 admits that it identified no document created on or before October 24 evidencing delivery, transmission, presentation, or display of that notice. The TWC response does not identify which writing it meant or establish that the August 30 notice was delivered. Percepta's sworn answer to Interrogatory 4 states that it terminated Plaintiff "for violating Defendant's Code of Conduct," after recounting the October 8 and October 14 communications described in paragraphs 117 and 119, and also cites Plaintiff's conduct during the termination meeting, which occurred after the decision had been made. (Interrogatory 4, p. 5; RFA 15.) That account differs from the PIP and Acceptable Use Policy explanation given on the termination call and from the account submitted to TWC. Plaintiff disputes that he violated the Code of Conduct or any PIP condition, including in the October 22 exchange, and disputes Percepta's characterization of his conduct during the termination meeting.

135. Plaintiff alleges that the different dates, unidentified discharge actor, ambiguous written-notice entry, nondelivery admission, substituted October 22 incident, and later expansion of the asserted grounds support an inference that Percepta's termination chronology and stated reasons were not fixed or reliably reported. Plaintiff relies on the employer-origin statements and the comparison among Percepta's accounts, not on any TWC finding, benefits determination, appeal disposition, or agency conclusion. He does not ask this Court to give any such agency matter preclusive effect or infer liability merely from an administrative-form error.

136. Plaintiff does not assert an independent post-employment retaliation claim based solely on Percepta's defense of the unemployment proceeding or the later request for a hearing. The facts

in paragraphs 133–135 are alleged as evidence bearing on the credibility, consistency, and pretextual character of the reasons Percepta gives for the pleaded employment actions.

**E. PERSONAL INVOLVEMENT AND CAUSATION**

137. Cadotte supplied accounts and authored discipline relied upon by termination participants. Plaintiff alleges that he intentionally converted protected opposition and the underlying work disputes into adverse employment grounds, as detailed in paragraphs 52, 92, 107–111, 116, and 166.

138. Darren Smith’s complaint-linked assessment, removal proposal, disciplinary input, and termination decision connect his knowledge of Plaintiff’s opposition to the challenged actions. His separately alleged retaliatory and racial motives rest on the conduct stated in paragraphs 65–70, 89, 101, 121, 167, and 182.

139. Briseño’s knowledge and personal control of PIP timing, authorship of the October warning, and participation in termination supply his alleged causal role. Those acts are detailed in paragraphs 66, 106, 118, 121, and 168.

140. Paula Smith’s complaint review, preparation and delivery of the PIP, receipt of the warning script, and termination participation are detailed in paragraphs 77, 105–110, 118, 121, and 169. Her inability to independently assess technical work bears on her reliance, not an independent statutory violation.

141. Percepta identifies five Hickey-authored items among the materials termination participants relied upon: December 26, January 9, May 20, and May 24 communications and a compilation of messages with Plaintiff. Plaintiff disputes Percepta’s characterization of those items as documenting performance or conduct deficiencies warranting discipline or termination. Plaintiff alleges that Hickey’s warning characterization, monitoring, later transmissions, and corrective-

notice input intentionally supplied grounds used in discipline and termination. His own knowledge, unequal treatment, and causal contribution are detailed in paragraphs 37–39, 51–53, 83–86, 170, and 183; he is not alleged to have made the final termination decision.

142. Clark's complaint-closure, attendance, timeline, and drafting decisions are detailed in paragraphs 80–81, 99–101, and 171. Plaintiff alleges that she knowingly advanced adverse characterizations despite the explanations and records supplied to her and that their adoption in the disciplinary process caused his contractual injury.

143. Shaw's knowledge, evaluation of cooperation, drafting exchanges, and revision coordination are detailed in paragraphs 71–76, 82, 99–104, and 172. Plaintiff alleges that she knowingly advanced a selective account of his protected opposition and work disputes that supplied grounds used in discipline and termination.

144. Plaintiff alleges coordinated participation from the connected communications and decision use. Darren Smith directed the course; Clark and Shaw knowingly helped construct its asserted basis; the other individuals contributed through their identified acts. No unidentified agreement or collective intent substitutes for each person's knowledge, conduct, and causal role.

145. Percepta's interrogatory answers, the meeting accounts, and Plaintiff's correspondence identify the respective participants' knowledge and acts. Verification of a discovery answer or possession of a corporate title alone is not a basis for liability.

146. The individual claims concern intentional interference with Plaintiff's own employment contract through each Defendant's personally attributed conduct, not supervisory status or another person's acts.

147. Percepta acted through its managers, HR officials, and decisionmakers within their employment responsibilities. Their alleged knowledge, conduct, and decision use support the claims against Percepta.

148. Alternatively, a decisionmaker without personal animus adopted intentionally retaliatory grounds supplied by Cadotte, Hickey, Clark, and Shaw and advanced or implemented through Darren Smith's, Briseño's, and Paula Smith's respective acts. Plaintiff alleges the reliance stated in paragraphs 94 and 100 and that termination would not have occurred without that retaliatory influence. Each individual's liability still rests on personal intent and causal contribution. Count V separately alleges discriminatory influence from Cadotte's and Hickey's race-based acts, as detailed in paragraphs 181, 183, and 185.

149. The combined circumstances support pretext: favorable merit status; unequal assistance and comparator treatment; Cadotte's admitted defensiveness about job-related scrutiny; actual complaint notice; complaint-linked disciplinary language; the removal proposal preceding the PIP; Briseño's timing control and warning authorship; the corrected delivery account; disputed PIP examples; acknowledged improvement; and termination reliance. Plaintiff relies on their combined force, not any isolated statement or unsuccessful document search as conclusive proof.

150. Plaintiff alleges that unequal support and work attribution affected his performance, that his questions and race-related complaints were characterized as deficiencies, and that those characterizations entered discipline and termination. The SentinelOne follow-up, corrective notice, nonperformance assessment, and PIP/AUP explanations illustrate the alleged process; ordinary subjectivity or unfairness alone does not establish race or retaliation causation.

151. Plaintiff alleges that his protected opposition was a but-for cause of the challenged retaliation, including termination. Separately and alternatively, he alleges that race was a but-for

cause of the contractual injuries in Counts V and VII and a motivating factor in the Title VII race discrimination alleged in Count VI. Different acts and different Defendants are subject to the specific allegations and counts that follow.

## COUNT I — TITLE VII RETALIATION FOR OPPOSING RACE DISCRIMINATION AND DISPARATE TREATMENT AGAINST PERCEPTA

152. Plaintiff incorporates the factual allegations in paragraphs 9–151, and the losses and remedies in paragraphs 209–216. This Count is against Percepta only.

153. With knowledge of Plaintiff's protected race-related opposition, Percepta imposed materially adverse discipline, restrictive supervision and work arrangements, the September 24 PIP carrying a termination threat, and the October 24 termination. These actions and their concrete consequences would dissuade a reasonable worker from opposing discrimination. Plaintiff challenges the PIP and termination independently: but for his protected opposition known before each decision, Percepta would not have taken that action. Other acts support this claim where independently actionable or relevant to motive and causation; Count I does not depend on Count II's environment theory.

154. The stated reasons were pretextual for the reasons alleged. Percepta's conduct caused the losses in paragraphs 209–216. Plaintiff seeks the legal and equitable remedies available under 42 U.S.C. §§ 2000e-3(a), 2000e-5(g), and 1981a, subject to applicable limits and without duplicate recovery.

## COUNT II — TITLE VII RETALIATORY HOSTILE WORK ENVIRONMENT FOR OPPOSING RACE DISCRIMINATION AND DISPARATE TREATMENT AGAINST PERCEPTA

155. Plaintiff incorporates paragraphs 9–151, paragraph 154, and paragraphs 209–216. This Count is against Percepta only. The recurrent retaliatory course was objectively and subjectively hostile, interfered with work, and was sufficiently severe or pervasive to alter working conditions; alternatively, its cumulative effect would dissuade a reasonable worker from

continued protected opposition. But for that opposition, Percepta's complaint-aware managers and HR officials would not have created or continued the course. Plaintiff seeks the relief in paragraphs 209–216. This theory is pleaded alternatively if legally cognizable; its rejection would not eliminate Count I's independent PIP and termination claims.

**COUNT III — TITLE VII RACIAL HOSTILE WORK ENVIRONMENT AGAINST PERCEPTA**

156. Plaintiff incorporates paragraphs 9–151 and 209–216. This Count alleges race-based harassment against Percepta, separately from Counts I and II's retaliation theories.

157. Plaintiff was subjected to unwelcome, recurring treatment because he is African American, including the subordinating remarks, unequal assistance, exclusion, and humiliating work interactions alleged above. The alleged racial connection rests on those circumstances collectively; Plaintiff does not contend that every unpleasant workplace interaction was racial harassment.

158. The race-based pattern was sufficiently severe or pervasive to create an objectively and subjectively abusive working environment and alter Plaintiff's employment conditions. Percepta knew of the conduct through repeated reports to supervisors and HR and failed to remedy the continuing pattern adequately. Plaintiff alleges employer responsibility for supervisors' conduct and, as to coworker conduct, notice and failure to take prompt, effective remedial action. He also alleges that discriminatory supervisory conduct culminated in his termination. This Count relies on the recurring conduct and cumulative working conditions described in paragraphs 47–59 and 129–132, not on termination alone converting otherwise unrelated events into a hostile environment. He used available reporting channels as described above.

159. At least one contributing act occurred within the applicable charge period. The resulting injuries and relief sought are stated in paragraphs 209–216, subject to Title VII's limits.

## COUNT IV — SECTION 1981 RETALIATION FOR OPPOSING RACE DISCRIMINATION AND DISPARATE TREATMENT AGAINST ALL DEFENDANTS

160. Plaintiff incorporates paragraphs 9–151 and 209–216. This Count relies on the actor-specific allegations below and does not seek to impose individual liability based merely on job title, supervisory status, or Percepta's liability.

161. This Count is asserted against Percepta and, in their individual capacities, Kelli Clark, Chauntre Shaw, Stephen Hickey, Derek Cadotte, Josue Briseño, Darren Smith, and Paula Smith.

162. Each individual's claim rests on personal knowledge, intentional acts, and causation. Insufficiency as to one Defendant does not eliminate an independently sufficient claim against another.

163. Plaintiff's employment relationship was a contract protected by 42 U.S.C. § 1981. He opposed perceived race-based impairment of his own contractual rights, including unequal conditions and treatment.

164. His protected opposition includes the early contextual reports alleged in paragraphs 36–40, the May reports of discriminatory hierarchy and unequal treatment, the June 5 race complaint, June 6 notice and race-related emails, August and September complaints to management and HR, and October 7 executive escalation. He reasonably and sincerely believed that the unequal treatment he reported was unlawful race discrimination. For each challenged act, Plaintiff relies on opposition actually known to the responsible actor before that act; later complaints do not retroactively supply earlier knowledge.

165. Each individual Defendant knew that Plaintiff was opposing perceived race discrimination before undertaking the personally attributed conduct below. Each is sued for intentional acts that exercised, influenced, or supplied the asserted basis for employment authority over Plaintiff's contract—not for Percepta's conduct by respondeat superior.

166. Cadotte. Before the September PIP, October 8 warning, and termination, Cadotte had received Plaintiff's express complaints of race discrimination and retaliation. Cadotte admitted that Plaintiff's performance of his job exposed the team's "ineffectiveness" and made Cadotte defensive. He then supplied disputed performance and conduct accounts, helped prepare the undelivered August notice, authored and co-delivered the PIP, and sent the October 8 warning that treated Plaintiff's discrimination and retaliation communications as personal matters and harassment. The termination participants relied on Cadotte-supplied materials and treated the Acceptable Use Policy warning as a PIP standard at termination. Plaintiff alleges that Cadotte intentionally used those acts to procure discipline and termination and that, but for Plaintiff's protected opposition, Cadotte would not have created or supplied the challenged grounds and the resulting PIP and termination would not have occurred.

167. Darren Smith. Darren Smith knew by June 6 that Plaintiff had filed a race-discrimination complaint. The June 6 circulation to HR and Briseño contained Plaintiff's criticism of Smith's complaint handling. Plaintiff also expressly accused Smith personally of retaliation in the separate June 6 correspondence described in paragraph 69. Plaintiff does not assume that the separately displayed formal accusation preceded the covering message. In the circulation that conveyed Plaintiff's protected complaint, Smith asserted that Plaintiff was avoiding work by spending working time on lengthy communications—communications that included Plaintiff's participation in the complaint process and opposition to race discrimination and retaliation. Smith participated in placing Plaintiff under Cadotte, proposed immediate termination on August 21 before delivery of the August notice or September PIP, supplied input into the disciplinary record, participated in the termination decision, and announced the termination. Plaintiff alleges that Smith intentionally recharacterized protected communications as nonperformance and used

his decisionmaking authority to cause termination; but for Plaintiff's protected opposition, Smith would not have taken that course and the termination would not have occurred.

168. Briseño. Briseño received Smith's June 6 circulation of Plaintiff's express race-discrimination complaint. He controlled the timing of the September PIP, received Plaintiff's October 7 executive complaint of discrimination and retaliation, and the next day wrote the October 8 warning language, directed Cadotte to send it, copied two other termination participants, requested monitoring updates, and stated that they were approaching an end and that the updates would help close the matter as planned. He then participated in the termination decision and conducted the termination meeting. Plaintiff alleges that Briseño intentionally converted continuing protected opposition into a policy-violation ground and used that ground to cause termination; but for Plaintiff's protected opposition, Briseño would not have taken those acts and the resulting warning and termination would not have occurred.

169. Paula Smith. Paula Smith personally discussed Plaintiff's race-discrimination and retaliation complaints with him, reviewed the challenged managers' accounts, participated in preparing and co-delivering the PIP, received Briseño's October 8 instruction and verbatim warning script, and participated in the termination decision. She did so after acknowledging that she could not independently assess Plaintiff's technical performance and after Plaintiff had identified the PIP and subsequent warning as retaliation. Plaintiff alleges that she knowingly approved and implemented discipline and termination based on the challenged retaliatory characterizations; but for Plaintiff's protected opposition, she would not have undertaken that participation and the resulting PIP and termination would not have occurred.

170. Hickey. Hickey knew of Plaintiff's complaints concerning unequal assistance, harassment, discrimination, and retaliation and knew by June 6 of Plaintiff's express race-discrimination

complaint. After that knowledge, and after Plaintiff contemporaneously disputed the characterization in writing on June 4 (paragraph 63), he recirculated the disputed May 24 verbal-warning characterization to People Innovation, forwarded it to Darren Smith during the August disciplinary assembly, supplied input into the August Corrective Action Notice, and supplied five identified writings on which Percepta says the termination participants relied. Plaintiff alleges that Hickey intentionally supplied protected complaints and the underlying work disputes as disciplinary material that caused injury to Plaintiff's contract; but for Plaintiff's protected opposition, Hickey would not have supplied or characterized those materials for that purpose and the resulting discipline and termination would not have occurred. His May 24 email was the prior written notice Darren Smith cited when proposing immediate termination, as alleged in paragraph 86. Plaintiff does not allege that Hickey personally made the final termination decision.

171. Clark. Clark directly received Plaintiff's race-related complaints and June 6 complaint naming Darren Smith. Despite the written submissions, explanation for seeking counsel, and bereavement notice supplied to her, she made the disputed complaint-closure, noncooperation, and attendance characterizations described in paragraphs 80–81. With knowledge of Smith's removal proposal, she compiled a retrospective timeline and participated in drafting the corrective notice, including the review course described in paragraph 101 and the complaint-linked disciplinary account described in paragraphs 96 and 103. Plaintiff alleges that Clark knowingly selected and advanced those adverse characterizations to support punishment of his continued race-related opposition, and that her complaint and disciplinary work supplied grounds adopted in the PIP and termination process described in paragraph 100. Her June 4 and June 7 characterizations correspond to the reliance category Percepta identified as "the absence of

documentation and information Plaintiff submitted to Defendant's People Innovation ("PI") Team in May 2024 and in June 2024 despite multiple requests from the PI Team for the same" (paragraph 80). But for Plaintiff's protected opposition, Clark would not have taken that retaliatory course; but for her intentional contribution and its adoption, the resulting contractual injuries would not have occurred when and as they did.

172. Shaw. Shaw knew of Plaintiff's race complaint and his TWC complaint by June 13, heard his specific complaints and explanations during the August 6 meeting, recognized the reported Cadotte remark as a threat, and acknowledged the evidence he supplied. She then characterized his request for counsel before further answers as refusal to cooperate and participated in drafting the corrective notice after receiving Smith's removal proposal, including the draft exchange with Cadotte described in paragraph 102, her response to Smith's requested edits and coordination of review described in paragraph 104, and the complaint-linked account described in paragraphs 96 and 103. Plaintiff alleges that Shaw knowingly advanced a selective noncooperation and conduct account to support punishment of his protected opposition, and that her investigation and drafting work supplied grounds adopted in the PIP and termination process described in paragraph 100. But for Plaintiff's protected opposition, Shaw would not have taken that retaliatory course; but for her intentional contribution and its adoption, the resulting contractual injuries would not have occurred when and as they did. Shaw anticipated "legal ramifications" when she convened the August 6 meeting (paragraph 74), and the drafting exchange she conducted carried her own notice of the August 23 training deadline that Plaintiff had met (paragraph 102). Plaintiff does not allege that Shaw or Clark personally announced or made the final termination decision.

173. Percepta, acting through persons with actual knowledge of Plaintiff's protected opposition, imposed the September 24 PIP, treated the October 8 warning as a PIP requirement, and

terminated Plaintiff on October 24. Plaintiff alleges that his protected opposition was a but-for cause of each separately challenged action and that the stated performance and conduct grounds were not the genuine reasons for those actions.

174. Alternatively, even if one or more final decision participants lacked retaliatory intent, Cadotte's and Hickey's intentionally supplied disciplinary accounts, Clark's and Shaw's intentionally adverse complaint characterizations and corrective-notice contributions, Briseño's authored warning, and Darren Smith's characterization and removal proposal caused the challenged employment actions through the actual reliance alleged above. Paula Smith's own knowing adoption and implementation are alleged in paragraph 169. Plaintiff alleges that the resulting contractual injuries would not have occurred when and as they did without the respective intentional contributions and their adoption. This alternative causal-influence theory remains grounded in each individual's own retaliatory conduct; it does not impose vicarious liability on a person merely because another participant acted with animus.

175. The conduct alleged against each Defendant impaired the making, performance, conditions, or termination of Plaintiff's own employment contract. Plaintiff does not assert a free-standing workplace tort under § 1981 or a claim concerning another person's contractual rights.

176. Each individual's retaliatory intent is alleged from that person's knowledge, temporal sequence, words, conduct, and causal role. Negligence, mistaken judgment, copied-recipient status, or HR participation alone is insufficient.

177. The intentional retaliatory acts caused the losses specifically alleged below. Plaintiff seeks compensatory and punitive damages under § 1981 where the governing standards are proved, and equitable relief against Percepta to the extent available, without duplicate recovery.

**COUNT V — SECTION 1981 RACE DISCRIMINATION—DISPARATE TREATMENT AGAINST PERCEPTA, CADOTTE, DARREN SMITH, AND STEPHEN HICKEY**

178. Plaintiff incorporates paragraphs 9–68, 83–136, 137–138, 141, and 146–151, and paragraphs 209–216. This Count does not assert a race-discrimination claim against Briseño, Paula Smith, Clark, or Shaw individually.

179. Plaintiff is African American and was qualified for his network-engineering position. His at-will contract gave him rights to its performance, benefits, conditions, and continuation free from intentional race discrimination.

180. Percepta, acting through the identified managers, and Cadotte, Darren Smith, and Hickey through their own acts, imposed unequal support, work conditions, discipline, and termination because of Plaintiff's race. The comparative allegations concern another Senior Network Engineer working in the same network environment under Cadotte and overlapping management and HR participants. Plaintiff relies on the materially relevant similarities in job function, supervisor, work environment, documentation expectations, knowledge-transfer needs, and management review—not on a claim that every circumstance was identical. As to Hickey, Plaintiff also relies on his handling of the opposing participants in the same work conflicts, as alleged in paragraphs 37–39, 51–53, 56, and 83–86. The later Malisetty review is not alleged to have been authored or approved by Hickey; his liability rests on his own conduct described below. After his termination, Percepta assigned Plaintiff's remaining TTEC failover work to Malisetty, a non-African-American network engineer, as alleged in paragraph 95. Plaintiff also relies on the admitted junior status of that comparator when she received the support he was denied (paragraph 42), and on the absence of discipline of Randy Pickering, a non-African-American IT team member, arising from the same group exchanges Percepta lists as PIP incidents (paragraph 107).

181. Cadotte. Cadotte knew that Plaintiff was the only African-American engineer on the team. He required Plaintiff to seek cooperation from Sheldon after Plaintiff had reported racially subordinating treatment, tolerated resistance to Plaintiff's requests for tickets, documentation, peer review, testing information, and technical assistance, and later treated Plaintiff's resulting questions and objections as performance or conduct deficiencies. Cadotte acknowledged that Plaintiff was performing his job by exposing team "ineffectiveness" and that this made Cadotte defensive. He then authored or helped create discipline that individualized shared documentation and knowledge-transfer problems against Plaintiff while another Senior Network Engineer's documentation, diagram, training, and knowledge-transfer needs were treated as compatible with a Successful rating and developmental assistance. Plaintiff alleges that Cadotte personally imposed or procured unequal contractual conditions and discipline and that those injuries would not have occurred but for Plaintiff's race.

182. Darren Smith. Darren Smith knew that Plaintiff was the only African-American engineer and knew the substance of Plaintiff's reports of a race-linked caste-like hierarchy and unequal support. Smith maintained the challenged support arrangement, participated in assigning Plaintiff to Cadotte despite the reported threat and unresolved conflict, treated Plaintiff's efforts to document and oppose the unequal conditions as nonperformance, proposed immediate termination, and participated in the termination decision. Plaintiff alleges that Smith personally used his authority to maintain unequal contractual conditions and to cause discipline and termination that would not have occurred but for Plaintiff's race.

183. Hickey. Hickey knew Plaintiff's race and received his caste-like hierarchy and unequal-assistance reports. He allegedly burdened Plaintiff's requests for cooperation with a disputed warning and monitoring while accepting informal correction and continued opportunity for the

white coworker in the same disputes. After the reassignment announcement, he recirculated the disciplinary account on June 20, forwarded it to Darren Smith on August 26, and supplied corrective-notice input. Percepta identifies five Hickey-authored items among the termination materials, as stated in paragraph 141. Plaintiff alleges that Hickey intentionally advanced unequal contractual treatment because of race and that his contribution and the reliance on it caused the resulting injuries. But for Plaintiff's race, that treatment and resulting injury would not have occurred. This theory is separate from retaliation for protected opposition.

184. Race-based intent is alleged from the unequal treatment in context: each actor's knowledge of Plaintiff's race and reports, authority over work conditions, unequal assistance, comparative developmental opportunities, and disciplinary participation. Cadotte's June 13 statement supplies circumstantial context rather than an express racial admission. Hickey's role includes the unequal handling of the same work conflicts and later transmission of that account. Plaintiff does not infer racial motive merely from a complaint's timing or a workplace disagreement.

185. But for Plaintiff's race, the discriminatory contractual injuries alleged in this Count would not have occurred. Alternatively, the intentional race-based acts of Cadotte and Hickey caused Percepta's termination decision through the reliance described in paragraphs 141, 148, and 183, even if a final decision participant lacked personal racial animus. Plaintiff alleges each individual's own intentional conduct and causal contribution, not collective liability based solely on participation in the management process.

186. The discriminatory conduct caused the damages in paragraphs 209–216. Plaintiff seeks the remedies available under § 1981 against each Defendant responsible for that injury, without duplicate recovery.

## COUNT VI — TITLE VII RACE DISCRIMINATION—DISPARATE TREATMENT AGAINST PERCEPTA

187. Plaintiff incorporates paragraphs 9–59, 83–136, 137–138, 141, and 146–151, and paragraphs 209–216. This Count is against Percepta only.

188. Plaintiff was qualified and suffered injury to employment terms and conditions, including the unequal work support and disciplinary treatment alleged above, and was terminated. He alleges timely adverse employment actions under Title VII, with earlier acts supplying context as stated in paragraph 25. The October 24 termination independently caused harm to a term or condition of employment; this Count does not depend on every earlier workplace difference independently satisfying that standard.

189. Plaintiff's race was a motivating factor in the challenged employment practices, and Plaintiff also alleges that the challenged adverse decisions would not have occurred but for race. Percepta's asserted reasons were pretextual for the reasons alleged. The Title VII race theory is separately pleaded from the but-for retaliation theory.

190. Plaintiff seeks the damages in paragraphs 209–216 and other available Title VII relief. If Percepta establishes the statutory same-decision limitation on a motivating-factor theory, Plaintiff seeks the relief that remains legally available under that theory without surrendering his independent but-for claims.

## COUNT VII — SECTION 1981 RACIAL HOSTILE WORK ENVIRONMENT AGAINST PERCEPTA

191. Plaintiff incorporates paragraphs 9–151 and 209–216. This Count is against Percepta only.

192. The recurring unwelcome race-based conduct alleged in paragraphs 36–59 and 129–132 also impaired the conditions and benefits of Plaintiff's employment contract. But for his race, Plaintiff would not have experienced that discriminatory hostile environment.

193. The racial pattern was sufficiently severe or pervasive to alter his employment conditions, interfere with his work, and create an objectively and subjectively abusive environment. The alleged recurrence, duration, work interference, and claim-specific racial nexus are stated in paragraphs 47–59 and 129–132. Plaintiff relies on the conduct as a whole while distinguishing it from ordinary work disagreements and the separate retaliatory course.

194. Percepta is responsible for the managerial conduct alleged and for continuing coworker harassment of which it had notice and failed to remedy adequately. Plaintiff repeatedly sought assistance through managers and HR; he alleges that the continuing discriminatory conditions and their employment consequences persisted despite that notice.

195. Plaintiff suffered the losses in paragraphs 209–216 as a result and seeks the remedies available under § 1981, including compensatory and, upon the required showing, punitive damages. This Count asserts no individual hostile-environment liability.

## COUNT VIII — SECTION 1981 RETALIATORY HOSTILE WORK ENVIRONMENT FOR OPPOSING RACE DISCRIMINATION AND DISPARATE TREATMENT AGAINST PERCEPTA

196. Plaintiff incorporates paragraphs 9–151 and 209–216. This Count is against Percepta only and is pleaded separately and alternatively from the discrete-action retaliation claim in Count IV and the race-based hostile-environment claim in Count VII.

197. Plaintiff repeatedly opposed what he reasonably and sincerely believed was race discrimination, disparate treatment, and unequal impairment of his employment-contract rights. Percepta had actual knowledge of that opposition through the managers, Human Resources officials, and decision participants identified above.

198. Because Plaintiff continued that protected opposition, complaint-aware managers and officials subjected him to a cumulative retaliatory course that included restrictive and unequal work arrangements, compelled interactions with persons whose treatment he had reported,

heightened monitoring, adverse characterization of his protected communications, the disputed verbal-warning history, assembly of the undelivered final warning, the September 24 PIP, the October 8 policy warning, and the continuing threat of termination. Plaintiff alleges the course as retaliatory harassment while separately challenging the PIP and termination as discrete acts.

199. The alleged retaliatory course was objectively and subjectively hostile, interfered with Plaintiff's work, and was sufficiently severe or pervasive to alter the conditions of his employment contract. Alternatively, the course was materially adverse because, considered in context and cumulatively, it would dissuade a reasonable worker from reporting or continuing to oppose race discrimination and differential treatment.

200. But for Plaintiff's protected opposition, Percepta would not have subjected him to the retaliatory environment. Percepta is responsible for the conduct of the managers and officials who created, implemented, or continued that environment with actual knowledge of his protected opposition. Plaintiff suffered the losses in paragraphs 209–216 to the extent caused by this environment and seeks the remedies available under § 1981 without duplicate recovery. This Count asserts no individual hostile-environment liability. It is pleaded only if the governing law recognizes the retaliatory-environment theory; dismissal of that alternative would not eliminate the discrete § 1981 retaliation theory in Count IV.

**COUNT IX — FMLA INTERFERENCE AGAINST PERCEPTA**

201. Plaintiff incorporates paragraphs 9–23, 28, 29–35, 46, 89, 106, 107–128, 137–151, and 209–216. This Count is against Percepta only.

202. Plaintiff was an eligible employee, Percepta was a covered employer, and the meniscus injury, surgery, incapacity, continuing treatment, and medically necessary recovery leave alleged above qualified for protection under the FMLA. Plaintiff gave Percepta notice sufficient to make

it aware that he might need FMLA-qualifying leave; Percepta's own contemporaneous communication expressly identified potential post-surgery FMLA leave.

203. Percepta interfered with, restrained, or denied the exercise or attempted exercise of Plaintiff's FMLA rights by terminating him because he invoked anticipated medical leave and thereby preventing him from completing the FMLA process and taking job-protected leave for the disclosed surgery, incapacity, treatment, and recovery. Plaintiff does not allege that Percepta's regulatory deadline for providing eligibility or rights-and-responsibilities notices expired during the approximately thirty-seven hours before termination; the alleged interference is the termination that foreclosed the process and leave, not a standalone late-notice violation. This interference theory concerns denial of substantive leave and restoration rights and does not require proof of retaliatory intent. The separate retaliation theory in Count X alleges retaliatory motive.

204. Plaintiff was prejudiced because he lost the employment, compensation, benefits, job-protected leave, restoration rights, and employer-sponsored health coverage he would have retained had Percepta permitted the FMLA process and leave to proceed. He seeks only the relief authorized by the FMLA for this Count, including recoverable lost compensation and benefits, actual monetary losses, interest, liquidated damages unless Percepta proves the statutory defense, and appropriate equitable relief, without duplicate recovery.

## COUNT X — FMLA RETALIATION AGAINST PERCEPTA

205. Plaintiff incorporates paragraphs 9–23, 28, 29–35, 46, 89, 106, 107–128, 137–151, and 209–216. This Count is against Percepta only and is distinct from the interference theory in Count IX.

206. By notifying Percepta of the injury, medical appointment, likely surgery, and anticipated surgical leave, Plaintiff attempted to exercise and invoked rights protected by the FMLA.

Cadotte understood that notice as raising potential post-surgery FMLA leave and transmitted it to Paula Smith and Darren Smith, two participants in the termination decision.

207. Approximately thirty-seven hours after the written notice, and on the date of the disclosed medical appointment, Percepta terminated Plaintiff. The extraordinary temporal proximity, Cadotte's contemporaneous statement that the potential leave could complicate future planning, the receipt of that communication by termination participants, and the disputed and shifting termination chronology and reasons alleged above plausibly support causation. No communication identified by Percepta before October 22 fixed a termination date: on September 20 Briseño deferred the PIP pending a later "game plan," and on October 8 he described the matter as "getting closer to an end" without stating a date (paragraphs 106 and 118). Plaintiff alleges that, whatever consideration of discipline preceded his notice, the notice caused Percepta to accelerate and execute the termination within approximately thirty-seven hours, and that Percepta would not have terminated him when and as it did but for his attempt to invoke and use FMLA-protected leave.

208. The retaliation caused Plaintiff to lose employment, compensation, benefits, protected leave, restoration rights, and employer-sponsored health coverage, including the resulting net medical and surgical expenses alleged in paragraphs 209–216. Plaintiff seeks only the relief authorized by the FMLA for this Count, including recoverable lost compensation and benefits, actual monetary losses, interest, liquidated damages unless Percepta proves the statutory defense, and appropriate equitable relief, without duplicate recovery.

## DAMAGES APPLICABLE TO EACH COUNT

209. Plaintiff seeks the following losses only insofar as legally recoverable under the particular Count and caused by the Defendant's unlawful conduct. He seeks no duplicate recovery and no damages belonging solely to his wife.

210. Lost wages and benefits. Plaintiff's annual salary at termination was $97,137.50. He claims lost compensation, retirement contributions, and employment benefits from October 24, 2024, reduced by interim earnings and required offsets. Despite numerous applications and diligent efforts in a difficult job market, he remains without comparable work and continues seeking employment. He also seeks proven future wage, benefit, earning-capacity, and career-opportunity losses, with reinstatement or front pay in the alternative and no overlapping recovery.

211. Retirement liquidation. Plaintiff cashed out his 401(k) to meet expenses, including a March 4, 2025 distribution of approximately $12,008.83 gross. He claims applicable early-distribution tax or penalty, incremental tax burden, forfeited employer contributions, and reasonably provable lost tax-deferred growth. He claims the net injury from premature liquidation, accounting for distributions and overlapping wage or benefit recovery, not the entire distributed principal as an additional lost asset.

212. Primary residence. Lost income and continued unemployment made ownership and carrying costs unaffordable, requiring Plaintiff and his wife to list their residence to avoid foreclosure and further credit harm. The transaction expected to close September 21, 2026 did not close. Plaintiff does not know whether the buyer withdrew or intends to proceed; the property remains on the market. No completed sale, realized proceeds, sale discount, or completed foreclosure is alleged. Plaintiff claims causally attributable carrying, marketing, preservation, and other personal costs already incurred. Any later closing costs, relocation expenses, net equity loss, or compelled-sale discount must be legally recoverable and proved after accounting for sale proceeds and discharged debt.

213. Investment property. The separately identified investment property remains listed for sale, with foreclosure proceedings pending but no completed sale or foreclosure alleged. Lost employment income impaired Plaintiff's ability to maintain household and property obligations and made continued ownership unaffordable. He claims only his own financial interest in the property jointly owned with his spouse and his own resulting carrying, marketing, preservation, foreclosure-related, credit, and reasonably provable net rental or investment-income losses. Future transaction costs or equity losses depend on an actual disposition and proof. Overlapping descriptions of the property or loss do not create separate recovery.

214. Personal injuries. Plaintiff claims his own emotional distress, anxiety, humiliation, mental anguish, loss of enjoyment of life, and distress from unemployment, compelled listings, the unsuccessful September 21 transaction, threatened property loss, and depleted retirement savings. He also claims proven professional-reputation and employment-opportunity harm, without speculating about prospective employers' reasons for not hiring him.

215. Medical and surgical costs. Plaintiff underwent the surgery anticipated in his October 22 notice after termination ended employer-sponsored coverage and paid expenses out of pocket. He seeks net costs caused by loss of coverage he would otherwise have retained, accounting for replacement insurance, reimbursements, and other offsets.

216. Special damages and limits. Plaintiff specifically pleads the retirement-liquidation, compelled-listing, attempted-sale, investment-property, foreclosure-related, relocation, medical, surgical, and associated financial losses under Rule 9(g). Actual losses and reasonably foreseeable future losses are distinct and depend on records and later events. Punitive damages are sought where authorized upon proof that the particular Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights by knowingly punishing protected

opposition or imposing race-based injury. Title VII relief remains subject to its statutory limits; § 1981 damages are not subject to its compensatory-and-punitive cap. Plaintiff distinguishes wage and benefit relief from pecuniary and noneconomic damages. A finding concerning a PIP or environment alone does not establish every termination-related loss; each loss requires its own causal basis. Legal damages are sought from the jury and equitable relief from the Court.

## PRAYER FOR RELIEF

Plaintiff requests judgment against the Defendant or Defendants liable on each Count and:

A. A declaration that the proven conduct violated the applicable federal employment protections;

B. Back pay, lost benefits, and other compensation, with appropriate offsets and prejudgment interest;

C. Reinstatement or, if not feasible, front pay and appropriate restoration of employment benefits and records;

D. Compensatory damages for Plaintiff's own emotional, reputational, and consequential economic injuries, including the specifically pleaded retirement-liquidation, compelled-listing, attempted-sale, investment-property, foreclosure-related, credit, relocation, and out-of-pocket medical and surgical losses, to the extent established and legally recoverable;

E. Punitive damages against any Defendant whose conduct satisfies the applicable standard, subject to the limits governing the particular claim;

F. Appropriate equitable relief directed to Plaintiff's proven injuries, taxable costs, prejudgment and postjudgment interest as allowed, and reasonable attorney's fees if counsel appears and such fees are recoverable; Plaintiff does not request attorney's fees for his own pro se time;

G. For the FMLA counts, the wages, salary, employment benefits, actual monetary losses, interest, liquidated damages, and equitable relief authorized by 29 U.S.C. § 2617, without seeking emotional-distress or punitive damages under the FMLA; and

H. Such other relief as the Court deems just, with no duplicate recovery for the same injury. Plaintiff requests claim- and Defendant-specific adjudication; the legal or factual insufficiency of one alternative theory or the claim against one Defendant should not affect any independently sufficient Count.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable under Federal Rule of Civil Procedure 38.

Dated: September 22, 2026
Respectfully submitted,

/s/ Joel Thom
Joel Thom
129 Esparza Drive
Bastrop, Texas 78602
jthom.nyc@gmail.com
Telephone: (347) 470-6766
(no fax)
PLAINTIFF, PRO SE

## CERTIFICATE OF SERVICE

I certify that on September 22, 2026, I submitted the foregoing to the Clerk for filing through the Court's electronic submission system for pro se filers, and that on the same date I served it on counsel of record for Defendant Percepta, LLC by electronic mail, pursuant to Federal Rule of Civil Procedure 5(b)(2)(E) and the parties' mutual written consent to electronic service established June 8, 2026, at the following addresses: Matthew J. Hegarty, Hall & Evans, L.L.C. (hegartym@hallevans.com); and P. Clark Aspy (aspy@namanhowell.com) and Madison N. Preston (mpreston@namanhowell.com), Naman, Howell, Smith & Lee, PLLC. The individual Defendants are newly added parties. Plaintiff will serve Derek Cadotte, Darren Smith, Josue Briseño, Paula Smith, Stephen Hickey, Kelli Clark, and Chauntre Shaw with the issued summonses and filed Third Amended Complaint in accordance with Federal Rule of Civil Procedure 4 unless the respective Defendant waives service or authorized counsel agrees in writing to accept service on that Defendant's behalf.

/s/ Joel Thom
Joel Thom
129 Esparza Drive
Bastrop, Texas 78602
jthom.nyc@gmail.com
Telephone: (347) 470-6766
(no fax)
PLAINTIFF, PRO SE